**FREIGHTWAYS TERMINAL COMPANY,**
a Nevada corporation, and George
M. Sullivan, Appellants,

v.

**INDUSTRIAL AND COMMERCIAL CON-
STRUCTION, INC., Appellee.**

No. 291.

Supreme Court of Alaska.

May 24, 1963.

Richard R. Cole, Fairbanks, for appellants.

William V. Boggess, Fairbanks, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

This is a declaratory judgment action in which the plaintiff below sought the declaration of an easement for ingress and egress across the lands of the defendants. The trial court declared in favor of the plaintiff and the defendants have appealed.

Since the factual situation with respect to the land areas and roadways involved is not a simple one, we have found it helpful to make use of the following sketch in formulating a statement of the case for the reader:

A i r F i e l d

D

E

A

F

G

P e g g e r R o a d

← 60-ft. roadway

N

The outermost lines of the sketch represent the original boundaries of the Robert Ward Leslie Homestead, a rectangular 80-acre tract of land, nearby the City of Fairbanks and contiguous on the east to Peger Road, a public road. In 1953 or 1954 Leslie entered into an oral agreement to sell the south half (forty acres) to Donald R. Wright and brother. This agreement was later reduced to writing with some modifications and provided that the Wrights could transfer certain portions of the acreage they were buying to other persons directly through Leslie. The Wrights have since defaulted on the contract, apparently after the several conveyances hereinafter discussed.

The areas designated on the sketch as "A", "D", "E", "F" and "G" represent smaller tracts or parcels carved out by the Wrights from the property they were purchasing from Leslie. Donald Wright negotiated the sale of tract "A" to Richard L. Rivers. The tract was deeded on April 23, 1954, by the Leslies, husband and wife, directly to Rivers and the money received by Wrights from the sale was used as the down payment to Leslie for the entire acreage being purchased by them.

At the time of the sale of tract "A", easements were discussed between Rivers and the Wrights. They orally agreed that Rivers would give thirty feet from tract "A" and the Wrights would give thirty feet from tract "D" to provide a 60-foot roadway through the two tracts.[1] Even before the issuance of the deed to Rivers, the parties had already "pushed in" the road to provide access from Peger Road to the airfield which both were using at the time and which is shown on our sketch as lying just inside the west boundary of the forty-acre tract.

At right angles to this 60-foot roadway, the Wrights then constructed another road running southward along the west boundary of tracts "E" and "F". The original plan was to build a "horseshoe loop" road around combined tracts "A", "E" and "F" as outlined on the sketch, but the ground where the proposed road would have gone around the southwest corner of tract "F" was found to be too swampy and poorly drained to be economically feasible for completion of the project.

By warranty deed Rivers conveyed tract "A" to Consolidated Freightways, Inc., on March 5, 1957, and Consolidated in turn conveyed the tract on September 8, 1958, to Freightways Terminal Co., one of the defendants in this action. Neither deed mentions the 60-foot roadway across tracts "A" and "D" or reserves an easement for a roadway across tract "A". On this point, Wright testified that he had asked Rivers to specify such an easement in Rivers' deed of tract "A" to Consolidated Freightways, Inc., and that Rivers responded, "I don't want to get the paper work all fouled up with a bunch of additives * * * just leave it the way it is."

On April 30, 1957, the Leslies deeded tract "D" to Donald R. Wright and on the same date Wright deeded the tract to George M. Sullivan, the other defendant in this case. The instruments of conveyance are warranty deeds. Both reserve an easement for a road thirty feet wide, being the north thirty feet of the tract, but neither deed mentions the 60-foot roadway in question or an easement over the south thirty feet of the tract. Prior to the issuance of these last two deeds, Wright and Sullivan discussed the possibility that someday Sullivan might want to sell or lease tract "D" to the owner of tract "A" so that the two properties could be operated as a single tract and not be divided by the existing 60-foot roadway.

According to Wright's testimony, it was agreed between him and Sullivan that if one Wilbur G. Vehmeier, who then had a contract to buy tract "E" and needed the 60-

1. We gather from the record and have so shown on the sketch that the 60-foot roadway mentioned in the opinion above straddles the common boundary between tracts "A" and "D" and then continues in a straight line westward to form the north boundary line of tract "E" and provides access to the airfield.

foot roadway across tracts "A" and "D" for access to Peger Road, had no objection the easement for an access road could be changed. Provision was therefore made in the deeds to tract "D" for an easement from Peger Road over the north thirty feet of the tract; and it seems to have been contemplated that an additional easement immediately outside the west boundary of tract "D" would be obtained from the Leslies so that the substitute 30-foot roadway could be extended to tract "E". It does not appear in the record that such additional easement was ever obtained from the Leslies.

Wright persisted in his testimony that Sullivan agreed that the easement for the existing 60-foot roadway was to stand unless and until Sullivan could get Vehmeier to accept the alternate access road and the same had been constructed. Sullivan and Vehmeier never got together to discuss the easement question, and Wright stated that he himself did nothing more than to run a ditch for a power line on the proposed 30-foot roadway and that this ditch would eventually have been made into a roadway if Sullivan and Vehmeier had agreed to close the 60-foot roadway.

In the spring of 1956, Wright orally agreed to sell tract "E" to Vehmeier for the location of a warehouse. To consummate the sale, the Leslies on April 30, 1957, issued a deed for tract "E" to Wright, who in turn deeded to Vehmeier on January 20, 1958. As Vehmeier was cognizant of the 60-foot roadway across tracts "D" and "A", he did not require that an easement for the roadway be specified in the deeds. However, the deeds do mention the 60-foot roadway by way of designating a portion of it as the north boundary of tract "E".[2]

Vehmeier testified that before he received his deed to tract "E", he conducted a survey of the tract, using a plat of the Leslie Homestead furnished him by Wright.

This plat showed the 60-foot roadway across tracts "A" and "D" and its extension along the north boundary of tract "E". Vehmeier proceeded to develop tract "E" by laying gravel at the east side thereof and by moving a building onto the premises partly with the help of Garrison Fast Freight whose business Rivers was managing at the time. All hauling for this development work was done across the 60-foot roadway in question.

Vehmeier also testified that Rivers was cognizant of the survey which Vehmeier was making, as above mentioned, and of the plat furnished him by Wright for that purpose; that the oral agreement between Wright and Vehmeier for the sale of tract "E" and the survey thereof were made as early as 1956; and that Vehmeier in 1956 got Rivers, at that time manager of Garrison Fast Freight (apparently a pseudonym for defendant Freightways and its predecessor Consolidated), to move a military surplus warehouse building in panels onto tract "E" over Peger Road and the subject 60-foot roadway.

Vehmeier's daughter and son-in-law moved a trailer onto the tract in the fall of 1958 but lived there only until the summer of 1959. The warehouse has been utilized on the tract continuously since 1957 for the storing of equipment and material in connection with the construction business engaged in by Vehmeier and his successor in interest, the plaintiff.

In the fall of 1958 when a local utility company sought to install its power service to tract "E" by erecting poles along the 60-foot roadway across tracts "A" and "D", Garrison Fast Freight and Sullivan, over Vehmeier's protest, blocked the roadway by parking a van or lowboy trailer across it.[3] Rivers himself had never objected to Vehmeier's use of the roadway for access to tract "E", even while he was em-

2. The statement of the case as related in the opinion thus far was prepared chiefly from the testimony of Donald R. Wright and from exhibits sent up with the record.

3. The utility company subsequently erected its power line poles to tract "E" "by going down the north boundary of Tract D and along the west boundary of Tract D", as Vehmeier testified.

ployed as manager of its business by Garrison Fast Freight.[4]

Vehmeier stated that he knew that Sullivan was dealing with Wright for tract "D" in the spring of 1957 and that Sullivan once asked him, Vehmeier, if he had "any objection to moving the road over to the other end of his [Sullivan's] property." Vehmeier took the question as a joke and never answered it, "thinking of course that he [Sullivan] would know what my reaction would be." Vehmeier claimed that he had done "nearly all" of the maintenance work on the 60-foot roadway.

Defendant Sullivan, the only witness produced by the defense, testified that, in negotiating for the purchase of tract "D", he saw the Wright plat used by Vehmeier in making his survey of tract "E" and that it showed a "proposed" road between tracts "D" and "A". He stated that he informed Wright, in the presence of Rivers who owned tract "A" at the time, that he was not interested in buying tract "D" unless it could abut the Garrison Fast Freight property (tract "A"). Sullivan was then and there advised by Wright that the plat had never been recorded and that the easement could be moved up to the north end of tract "D" if Sullivan would agree, and that, if he would so agree, Wright would then extend the easement down to tract "E" on other land of the Wright brothers just outside the west boundary of tract "D".

Sullivan admitted that before he purchased tract "D" in 1957 he knew that Vehmeier had some interest in tract "E" and had a building thereon and that at the time he purchased tract "D" he was aware of the 60-foot roadway, though he could not recall ever discussing it with Vehmeier. He also admitted that the defendants, over Vehmeier's protests, blocked that roadway at various times through the years. He claimed that he spent $1,000 gravelling the roadway after he bought tract "D".

In the spring of 1959, about a half year after the defendants had blocked the 60-foot roadway for the first time, Wright, "to keep something like this out of court" as he put it, had a man start some ditch work on the 30-foot right of way at the north end of tract "D". The purpose of the ditch, he stated, was "to drain the property" and that it "eventually would have been a roadway if him [Sullivan] and Vehmeier had agreed on it." But Sullivan stopped the work because he claimed that it was being done too far over on tract "D" and not within the right of way lines. The work was never resumed for the reason, as given by Wright, that

"They [Vehmeier and Sullivan] couldn't agree to what they wanted to do, so I started it and I just quit. There was no sense in continuing if they weren't going to agree."

Photographs of the 60-foot roadway were introduced in evidence and identified as showing the road in substantially the same condition as it was when Vehmeier purchased tract "E". These photographs show the roadway in question as a well defined road from Peger Road westward to the warehouse on tract "E" and beyond. Vehmeier testified that the only existing access way for tract "E" is the 60-foot roadway across tracts "A" and "D".

The trial court found the facts as to the existence and interests in or ownership of tracts "A", "D" and "E" as well as the facts pertaining to the location, construction and duration in time of the 60-foot roadway in question to be as we have given them in this opinion. The court further found: (1) that said roadway is, and was at the time of the purchase of tract "E" by Vehmeier, the only way of ingress and egress for tract "E"; (2) that the roadway was constructed by the joint efforts of Wright and Rivers, within easements provided by them across their adjoining tracts of land, "for the purpose of providing access to Peger Road to and from the property lying to the West of the said tracts * * * including the property then owned or to be

4. The record indicates that Rivers was the Alaska manager for Garrison Fast Freight until March 1957 and was evi-dently succeeded in that position by Sullivan who first became an employee of the company in October 1956.

acquired by the Plaintiff's predecessor in interest [Vehmeier]"; (3) that when Sullivan acquired tract "D" he knew of the possession of tract "E" by Vehmeier "and of the use, and of the necessity of the use, of said road" by Vehmeier; (4) that Sullivan and Consolidated Freightways, Inc., both knew of the erection of a warehouse by Vehmeier on tract "E" and of its completion in the fall of 1957; (5) that Consolidated Freightways, Inc., never objected to the use of the roadway, and that defendants Sullivan and Freightways Terminal Company did not register any complaint to such use until the fall of 1958 or 1959; (6) that defendant Freightways Terminal Company "is estopped from preventing Plaintiff from using that portion of said road situate within the boundaries" of tract "A"; and (7) that on several occasions the defendants have blocked the roadway and prevented its use by plaintiff as an access road for tract "E" and threaten to do so in the future, thus presenting an actual controversy which should be speedily resolved in this action.

Upon the findings thus made, the trial court concluded as a matter of law that the plaintiff and his successors as owners of tract "E" have an easement in perpetuity in the 60-foot roadway for ingress to and egress from tract "E" "on any one of several alternate theories: by implication, by necessity, by dedication or by oral grant and estoppel"; and that the plaintiff is entitled to a judgment declaring the existence of said easement. A declaratory judgment was entered accordingly and the defendants have appealed specifying three errors, namely:

(1) The trial court erred in failing to enter adequate findings of fact and conclusions of law.

(2) The trial court erred in finding the facts specified in Finding of Fact Number X to be true.

(3) The trial court erred in holding that appellee [plaintiff] had an easement for access along the boundary line between property owned by appellant [defendant] George Sullivan and property owned by appellant [defendant] Freightways Terminal Company, Inc.

█ The first specification of error does not apprise this court in what respect the trial court's findings of fact and conclusions of law are inadequate and may therefore constitute noncompliance with the applicable provisions of Supreme Ct.R. 11(a)(6),[5] as claimed by the plaintiff. However, we need not decide that question in this case for we regard the principal issue here to be determined is whether the lower court was correct in its holding that the plaintiff had an easement for access to tract "E" along the common boundary line between tract "D" of the defendant Sullivan and tract "A" of the defendant Freightways Terminal Company, Inc. That issue we feel is properly raised in the third specification of error which we shall now consider.

█ The term "easement" has been variously defined by legal authorities,[6] but we shall confine ourselves in this case to the definition which states that an easement is the right which the owner of one parcel of land has by reason of such ownership to use the land of another for a specific purpose, such use being distinct from the occupation and enjoyment of the land itself.[7] In figurative language, the land subject to the easement is described as a "servient tenement" and the land enjoying the easement as the "dominant tenement".

---

5. Supreme Ct.R. 11(a)(6) reads in part: "When findings are specified as error, the specification shall state as particularly as may be wherein the findings of fact and conclusions of law are alleged to be erroneous."

6. Some of the definitions of the term "easement" and the decisions in which they were given are collected in 17A Am.Jur., Easements § 2 (1957) and in 3 Powell, Real Property para. 405 (1952).

7. Transcontinental Oil Co. v. Emerson, 298 Ill. 394, 131 N.E. 645, 648, 16 A.L.R. 507 (1921); Laden v. Atkeson, 112 Mont. 302, 116 P.2d 881, 883 (1941).

However, it is not necessary that the two tenements be contiguous or adjoining.[8]

At least one authority states that an easement can be created in as many as six different ways;[9] however, in the light of the facts of this case we need concern ourselves with only two kinds of easements, namely those created by implied grant or reservation and those created by estoppel. Even though in a particular conveyance of land there be no grant or reservation of an easement in express terms, an easement may nevertheless arise in such a case by implication, either for the benefit of the land conveyed (implied grant) or for the benefit of the land retained by the grantor as against the land conveyed (implied reservation), the purpose of the doctrine of implied easements being to give effect to the actual intent of the parties as shown by all the facts and circumstances.[10]

While a person cannot have an easement over his own land, he may make use of one part of his land for the benefit of another part and thus create what has been denominated a quasi easement.[11]

"If the owner of land, one part of which is subject to a quasi easement in favor of another part, conveys the quasi dominant tenement, an easement corresponding to such quasi easement is ordinarily regarded as thereby vested in the grantee of the land, provided, it is said, the quasi easement is of an apparent, continuous and necessary character. * * * It has been stated that 'the moment a severance occurs by the sale of a part, the right of the owner to re-distribute the properties of the respective portions ceases and easements or servitudes are created corresponding to the benefits and burdens mutually existing at the time of the sale. This is not a rule for the benefit of purchasers, only, but is entirely reciprocal. Hence, if instead of a benefit conferred a burden has been imposed upon the portion sold, the purchaser, provided the marks of this burden are open and visible, takes the property with a servitude upon it. The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the respective parts.' "[12]

Because easements by implication detract from the rule that written instruments speak for themselves, they are not favored;[13] and "the law will imply an easement in favor of the grantee [implied grant] more readily than it will in favor of the grantor [implied reservation]."[14]

8. Kaynor v. Fisch, 103 Cal.App.2d 832, 230 P.2d 418, 422 (1951); Tide-Water Pipe Co. v. Bell, 280 Pa. 104, 124 A. 351, 353, 40 A.L.R. 1516 (1924).

9. 3 Tiffany, Real Property § 776, at 240 (3d ed. 1939), listing easements by (1) express grant; (2) reservation or exception in a conveyance of land; (3) implied grant or reservation; (4) prescription; (5) a statutory proceeding usually under power of eminent domain; and (6) estoppel.

10. Owsley v. Hamner, 36 Cal.2d 710, 227 P.2d 263, 268, 24 A.L.R.2d 112 (1951); Van Sandt v. Royster, 148 Kan. 495, 83 P.2d 698, 701–702 (1938); Mitchell v. Castellaw, 151 Tex. 56, 246 S.W.2d 163, 167 (1952).

11. Van Sandt v. Royster, supra n. 10, 83 P.2d at 700. The court observed: "The so called quasi easement is evidently not a legal relation in any sense, but the expression is a convenient one to describe the particular mode in which the owner utilizes one part of the land for the benefit of the other."

12. 3 Tiffany, Real Property § 781, at 255–256 (3d ed. 1939); see also Adams v. Cullen, 44 Wash.2d 502, 268 P.2d 451, 453 (1954). It does not seem to Tiffany that the presence or absence of any or all of the three characteristics required by the courts for the establishment of a quasi easement—that the user be apparent, continuous and necessary—should be conclusive. Op. cit. supra, at 257.

13. Orr v. Kirk, 100 Cal.App.2d 678, 224 P.2d 71, 73 (1950); Trattar v. Rausch, 154 Ohio St. 286, 95 N.E.2d 685, 688 (1950).

14. Krinsky v. Hoffman, 326 Mass. 683, 95 N.E.2d 172, 175 (1951). See also Orr v. Kirk, supra n. 13.

There is a difference of opinion among the authorities as to the degree of necessity required to create an easement either by implied grant or by implied reservation. At one extreme are those who hold that the easement must be strictly necessary, and at the other are those who require that the easement must be merely convenient to the proper enjoyment of the land.[15] For Alaska we adopt the rule that the test of necessity [16] is whether the easement is reasonably necessary for the beneficial enjoyment of the property as it existed when the severance was made,[17] regardless of whether the easement is one of implied grant or of implied reservation.[18]

An easement may also be created by oral grant and estoppel. The rule is stated by Tiffany as follows: "In case there is an attempted oral grant of an easement, and the intended grantee makes improvements for the purpose of exercising the easement, equity will recognize and enforce the easement on the theory of what is ordinarily referred to as that of part performance but which is essentially the theory of estoppel." [19]

Thus, in a recent Texas case, where the parties agreed to grant to each other easements over portions of their separate but adjoining lands, for the purpose of making an alleyway to be used by them and their tenants for an access way to such lands and then paid consideration by way of contributing to the cost of paving the alleyway and delivered possession to each other by use of the property for the purpose contemplated, the court, under the rule stated, properly held that the parties acquired easements by estoppel over the lands of each other even though the written instrument purporting to convey such easements was never fully executed and delivered.[20] Such an easement by oral grant and estoppel ex-

15. For a more complete listing of the various terms used by the courts to describe the degree of necessity required to create an implied easement, with liberal citations to case law, see 3 Tiffany, Real Property § 786 (3d ed. 1939); also 3 Powell, Real Property para. 411, at 431–433 (1952).

16. "Necessity" and "necessary" as we have used those words in this opinion when speaking of one of the requirements of an implied easement resulting from a preexisting quasi easement must not be confused with what is known in the law as an easement or way by necessity. Scott v. Palms, 48 Mich. 505, 12 N.W. 677 (1882); Bray v. Hardy, 248 Iowa 794, 82 N.W.2d 671, 674 (1957). Such a way may arise where an owner of land conveys to another an inner portion which is entirely surrounded by lands owned by the conveyor or by the conveyor and another. In such a situation a right of access across the retained land of the conveyor is normally found, based upon public policy which is favorable to full utilization of land and presumption that parties do not intend to render land unfit for occupancy. Brown v. Kemp, 46 Or. 517, 81 P. 236 (1905); Condry v. Laurie, 184 Md. 317, 41 A.2d 66, 68 (1945). Such a way ceases when the necessity therefor ceases. Waubun Beach Ass'n v. Wilson, 274 Mich. 598, 265 N.W. 474, 478, 103 A.L.R. 983 (1936).

17. Among the states which follow the rule stated in the text and to which this note is referenced are California, Idaho, Oklahoma, Oregon and Washington. See Fristoe v. Drapeau, 35 Cal.2d 5, 215 P. 2d 729, 731 (1950); Davis v. Gowen, 83 Idaho 204, 360 P.2d 403, 407, 88 A.L.R. 2d 1192 (1961); Gorman v. Overmyer, 199 Okl. 451, 190 P.2d 447, 450–451 (1947); Jack v. Hunt, 200 Or. 263, 264 P.2d 461, 464, 265 P.2d 251 (1953); Silver v. Strohm, 39 Wash.2d 1, 234 P.2d 481, 483 (1951).

18. Jordan v. Henck, 166 Cal.App.2d 321, 333 P.2d 117, 119–120 (1958), in which the court added this comment: "Because of the rule that the words of a conveyance are to be construed more strictly against the grantor than against the grantee, the court will be more circumspect in its approach to decreeing an easement by reservation in favor of a grantor than it will for a grantee"; Bray v. Hardy (Iowa), supra n. 16; Sievers v. Flynn, 305 Ky. 325, 204 S.W.2d 364 (1947); Jack v. Hunt (Or.), supra n. 17.

19. 3 Tiffany, Real Property § 801, at 318–319 (3d ed. 1939). See also 3 Powell, Real Property para. 411, at 435–436 (1952).

20. Union Properties Co. v. Klein, 333 S.W. 2d 864, 865 (Tex.Civ.App.1960). See

tends to the grantees of the original owners, who take with notice of the way, although it was not expressly reserved.[21]

We proceed now to apply the foregoing legal principles to the case at hand, giving our attention first to tract "A" since it appears to have been the first parcel to be severed from the ownership in Donald R. Wright of the south forty acres of the Leslie Homestead. Here we find existing all of the elements held to be essential to the creation of an easement by oral grant and estoppel. In connection with Wright's sale and transfer of tract "A" to Rivers, which made the parties owners of adjoining lands, Wright orally granted to Rivers an easement thirty feet wide running the full length of the south end of tract "D" and at the same time Rivers orally granted to Wright an easement thirty feet wide running the full length of the north end of his tract "A" to provide as a right of way the 60-foot roadway for access "to Tract 'E' that I [Wright] agreed to sell to Mr. Vehmeier and to the airfield and the other property behind."

 Wright and Rivers had already begun construction of the roadway at the time they made their oral agreements and used the road for their mutual benefit in getting from Peger Road to the airfield and, when Wright negotiated the sale of tract "E" to Vehmeier in 1956, the latter was soon using the roadway for another of its contemplated uses, namely, as an access way for tract "E". It had taken Wright and Rivers "a couple of years" to get the roadway into a usable condition because of the prevailing permafrost and swampy ground and thereafter both Wright and Vehmeier continued to improve and maintain the roadway. The roadway was so apparent and so openly used by Vehmeier that it could not be said that defendant Freightways Terminal Company, grantee of Rivers, took without notice of the way.

So we find no error in the trial court's holding that the plaintiff had an easement for access to tract "E" over that portion of the 60-foot roadway which consisted of the north thirty feet of tract "A".

Neither do we find any error in the holding below that the plaintiff had an easement in the remander of the subject roadway which was made up of the south thirty feet of defendant Sullivan's tract "D". There is ample evidence in the record to establish an easement in tract "D" by implied reservation for the use and benefit of tract "E", under the legal principles above set forth.

While Wright was still the owner of both tracts, he made use of tract "D" for the benefit of tract "E", as is evidenced by the construction and utilization of the 60-foot roadway, thus creating a quasi easement in the servient tenement tract "D" in favor of tract "E" as the dominant tenement. We believe it can be fairly stated that by the time the unity of ownership in Wright was severed by conveyance of tract "D" to Sullivan, the quasi easement had been used openly and continuously for a sufficient length of time to indicate that its use as an access way for tract "E" was intended to be permanent. Sullivan himself was so impressed by the existence and use of the easement in favor of tract "E" that he enquired about the possibility of having it shifted to the north end of tract "D" and thus eliminate the roadway between tracts "A" and "D".

As to the legal requirement that the implied easement must be reasonably essential to the use and enjoyment of the dominant estate, we find that it, too, has been met in this case. The roadway in question, of which the thirty foot strip of land at the south end of tract "D" was an integral part, was the only way of access in existence from tract "E" to Peger Road at the time that Sullivan became the owner of tract

also Stouder v. Dashner, 242 Iowa 1340, 49 N.W.2d 859, 866 (1951); Oliver v. Wilhite, 227 Mo.App. 538, 55 S.W.2d 491 (1932).

21. Forde v. Libby, 22 Wyo. 464, 143 P. 1190, 1192–1193 (1914), followed in Wright v. Barlow, 169 Okl. 472, 37 P. 2d 958, 960 (1934).

"D". Any other way would have had to be by a more circuitous route, assuming that one were even available to the owner of tract "E" at that time; and, judging by the time and effort expended in the construction of the 60-foot roadway, and from other evidence in the record, we cannot say that such a substitute road could have been built at reasonable expense.[22]

Defendants' second specification of error that the trial court erred in its finding No. X warrants only brief comment: That finding was to the effect that an easement for the use of the south thirty feet of tract "D" was orally granted to plaintiff (Vehmeier's successor in interest) at the time Wright orally agreed to sell tract "E" to Vehmeier in 1956. The finding is undoubtedly erroneous but it does not affect the decision in any way because, as we view the law and the evidence in this case, the easement under consideration rested upon an implied reservation and not upon any express grant written or oral.

Finding no reversible error in the record, we affirm the judgment of the trial court.

---

**22.** The amount of the expense to one claiming an easement by implication of providing a substitute for such easement is taken into consideration by the courts in determining whether an implied easement is reasonably necessary to the beneficial enjoyment of the land granted or retained. See Schnider v. M. E. H. Realty Inv. Co., 239 Mo.App. 546, 193 S.W.2d 69, 73 (1946); Frater Oklahoma Realty Corp. v. Allen Laughon Hardware Co., 206 Okl. 666, 245 P.2d 1144, 1148 (1952); Allison v. Allison, 29 Tenn.App. 99, 193 S.W.2d 476 (1945).