John and Janie O'BUCK, Appellants,

v.

COTTONWOOD VILLAGE CONDOMIN-
IUM ASSOCIATION, INC., An Alaska
Non–Profit Corporation, Appellee.

No. S–1786.

Supreme Court of Alaska.

March 4, 1988.

Donald D. Hopwood and David Gorman, Kay, Saville, Coffey, Hopwood & Schmid, Anchorage, for appellants.

William L. McNall and David Rankine, Law Offices of William L. McNall, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

In this case the owners of a condominium unit brought suit against the condominium association challenging a rule banning the mounting of television antennae anywhere on the buildings. After a non-jury trial, the superior court entered judgment in favor of the association.

We hold the rule banning antennae valid and thus affirm.

### I.

John and Janie O'Buck, plaintiffs and appellants in this case, purchased a unit in the Cottonwood Village Condominiums in June 1981. At that time, the unit was pre-wired for a central television antenna and for Visions, an antenna-based cable system. It is impossible to watch television in the unit without an outdoor antenna or cable because of bad reception. The availability of an antenna was an important consideration for the O'Bucks in deciding to purchase their unit because they have four televisions and frequently watch different programs.

In 1984, the Board of Directors of the Cottonwood Village Association ("the Board" or "the Association") had to ad-dress a serious problem of roof leakage in the condominiums. Among the several causes of leakage were badly mounted antennae and foot traffic on the roof related to the antennae. The Association paid $155,000 to have the roofs repaired. In order to do the work, the contractors removed all the antennae from the roofs. Before any of the antennae were reinstalled, the Board adopted a rule prohibiting the mounting of television antennae anywhere on the buildings. The purposes of this rule were to protect the roof and to enhance the marketability of the condominium units. The Board further decided to make the MultiVisions cable system available as an alternative to antennae. The Board rejected other alternatives such as a satellite dish or antennae mounted on the sides of the buildings. The Board offered to pay the fifteen dollar hookup fee to MultiVisions and to pay for the depreciated value of the old antennae. The O'Bucks were paid $284.20 for their antenna, which had been damaged when contractors removed it from the roof. The O'Bucks now have one television hooked up to MultiVisions. Their other sets have no reception, and it would cost ten dollars per month per set to hook them up.

The O'Bucks subsequently filed a complaint against the Association seeking damages and an injunction against enforcement of the rule. After a non-jury trial the superior court ruled against the O'Bucks on all issues, denying them any relief. The superior court awarded the Association $8,000 in attorney's fees, which constituted nearly 80% of the Association's total actual fees.

In this appeal, the O'Bucks argue that the Board had no authority under the Declaration and Bylaws of the Condominium Association to adopt the antennae rule, that the rule was unreasonable, that the procedure by which the Board passed the rule was flawed, that the O'Bucks have an easement for their antenna, and that it was an abuse of discretion for the trial court to award the Association such a high percentage of its attorney's fees.

## II.

### A. *Was the Board Authorized to Pass the Rule?*

■ The O'Bucks challenge the Board's authority to adopt the rule. We conclude that the Board had authority to enact a rule banning television antennae from buildings under either of two provisions in the Declaration of Condominium, the "constitution" of the Association. *See* AS 34.-07.010–.070.

First, article IX, section 4 of the Declaration authorizes the Board to adopt rules and regulations governing the use of the common areas, which include the roofs and walls of the buildings. That section provides:

> *Rules and Regulations.* Rules and regulations may be adopted by the Board of Directors concerning and governing the use of the general and limited common areas providing such rules and regulations shall be furnished to owners prior to the time they become effective and that such rules and regulations shall be uniform and nondiscriminatory.

Second, article XIX, section 1(d) of the Declaration authorizes the Board to require unit owners to take action to preserve a uniform exterior appearance to the buildings. That section provides:

> In order to preserve a uniform exterior appearance to the building, the Board may require the painting of the building, decks and balconies, and prescribe the type and color of paint, and *may prohibit,* require, or regulate *any modification* or decoration of the building, decks and balconies undertaken or proposed by any owner. This power of the Board extends to screens, doors, awnings, rails *or other visible portions of each condominium unit and condominium building.* The Board may also require use of a uniform color of draperies or drapery lining for all units.

(Emphasis supplied.) The superior court relied on this provision in reaching its decision.

Given these two provisions, the Board had authority to ban antennae either on roof-protection grounds (under article IX, section 4) or on aesthetic grounds (under either section), both of which were given as reasons for the antennae rule.[1]

The O'Bucks argue that other provisions of the Declaration and Bylaws imply a right to own antennae that is superior to the Board's authority to ban them. Therefore, they argue that any antennae rule could be passed only after amendments to the Declaration and Bylaws, which would require approval by 60% of the unit owners.[2]

The O'Bucks infer the right to mount television antennae on the buildings from article V, section 5 of the Declaration, which protects the ownership of private property in common areas:

> Certain items which might ordinarily be considered common areas, such as, but not limited to, screen doors, window boxes, awnings, storm windows, planter boxes, *antennae,* and the like, may, pursuant to decision of the owner and speci-

---

1. The Declaration and Bylaws charge the Board with the responsibility of passing such rules, within its discretion, in the best interests of the unit owners. This conclusion is reinforced by two other provisions which grant the Board authority over design and structural matters. Article IX, section 5 of the Declaration provides:
   *No Unauthorized Additions, Alterations or Decorations.* No additions, alterations or decorations to any common area, including those exterior common areas designated as limited common areas, shall be commenced, erected or maintained without the prior written approval of the Board of Directors as to the conformity and harmony of external design and location with existing structures in the project.

Article VIII, section 1(h) of the Bylaws provides:
   Nothing shall be allowed, done or kept in any Unit or common areas of the Project which would overload or impair the floors, walls or roofs thereof, or cause any increase in the ordinary premium rates or the cancellation or invalidation of any insurance thereon maintained by or for the Association, nor shall any noxious or offensive activity or nuisance be made or suffered thereon.

2. A 60% vote of the unit owners is required to amend the Declaration or Bylaws by article XIII, section 3 of the Declaration and by AS 34.07.020(13).

fications in the Bylaws or administrative rules, be designated as private or individual items to be furnished and maintained at individual expense, in good order, according to standards and requirements set by the Board by rule, regulation or Bylaw.

(Emphasis supplied.) They also cite article VIII, section 1(g) of the Bylaws, which provides:

No Unit Owner or occupant shall, without the written approval of the Board of Directors, install any wiring for electrical or telephone installations, *television antenna* [sic], machines or air-conditioning units, or other equipment or appurtenances whatsoever on the exterior of the Project or protruding through the walls, windows or roof thereof.

(Emphasis supplied.) The O'Bucks also cite several provisions of the Declaration and Bylaws which explicitly prohibit or authorize the prohibition of other things, such as pets, modification of buildings, and posting of bills. They reason that since there is no explicit authorization to prohibit antennae, and since the Declaration and Bylaws contemplate the existence of antennae, a right to have an antenna is reasonably inferred and cannot be taken away without amending the Declaration or Bylaws. They rely on *Beachwood Villas Condominium v. Poor*, 448 So.2d 1143, 1145 (Fla. App.1984), which held: "provided that a board-enacted rule does not contravene either an express provision of the declaration *or a right reasonably inferable therefrom*, it will be found valid, within the scope of the board's authority." (Emphasis supplied.)

■ We do not find the O'Bucks' arguments persuasive. The mere mention of the word "antennae" in article V, section 5 of the Declaration does not allow an owner reasonably to infer a right that is superior to the Board's authority to ban them. First, that section explicitly makes the items listed, including antennae, subject to rules and regulations of the Board. Second, article V merely defines what constitutes common areas, and the purpose of section 5 is to clarify that the privately-owned items listed do not necessarily pass into common ownership merely because of their presence in common areas. An owner may not seize upon such a clarification to claim an irrevocable right to maintain any of the items listed in a common area.

The absence of any provision explicitly authorizing the Board to ban antennae is not fatal to the Board's right to do so. As noted in *Beachwood Villas*, "[i]t would be impossible to list all restrictive uses in a declaration of condominium." 448 So.2d at 1145. Thus, in that case the court upheld board-enacted rules regulating unit rentals and the occupancy of units by guests during the owner's absence. The court refused to find a reasonably inferable right and upheld the rules even in the absence of an express provision authorizing them. *Id.*

The O'Bucks also rely on *Chateau Village North Condominium Association v. Jordan*, 643 P.2d 791 (Colo.App.1982). The board in that case began a policy of denying all new applications for pets. Cottonwood's Bylaw article VIII, section 1(g), *supra*, is similar to the bylaw provisions at issue in *Chateau Village:* "No cats, dogs, or other animal ... shall be kept, maintained, or harbored in the development unless the same in each instance is expressly permitted in writing by the Managing Agent...." 643 P.2d at 791. Both provisions explicitly prohibit the matter in question without written permission. The court in *Chateau Village* found in this bylaw provision a right to apply for permission to keep animals and a "duty" on the part of the association "to consider [the owner's] application and apply its discretion in a reasonable and good faith manner." *Id.* at 792. Because the association had adopted a policy of prohibiting all pets without ruling on the merits of individual applications, the court ordered that the complaint of the association against the owner be dismissed. *Id.* at 792–93.

The O'Bucks argue that under *Chateau Village*, Bylaw article VIII, section 1(g), requires the Association to deliberate on the merits of all applications to install antennae, and prohibits the Association from adopting a blanket rule against them. This interpretation fails to recognize important differences between the two cases. The

board in *Chateau Village* was merely applying "its own policy," 643 P.2d at 793, which it had implemented without any authority. *See id.* at 792. In contrast, the Board in the instant case acted under the authority of numerous provisions authorizing rules and regulations governing the use of the common areas. These provisions give the Board broad discretion to adopt rules and regulations to preserve a uniform exterior appearance to the building, as well as to preserve the structural integrity of the buildings in general and the roofs in particular. These grants of authority are adequate to uphold a blanket rule.

For these reasons, we hold that the Declaration and Bylaws granted the Board the authority to enact the subject rule banning television antennae on buildings.[3]

## B. *Was the Rule Reasonable?*

■ Both parties agree that a condominium association rule will not withstand judi-cial scrutiny if it is not reasonable. This standard of review is supported by case law and legal commentary. *See, e.g., Johnson v. Hobson*, 505 A.2d 1313, 1317 (D.C. App.1986); *Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180, 182 (Fla.App. 1975); Note, *Judicial Review of Condominium Rulemaking*, 94 Harv.L.Rev. 647, 658 (1981) [hereinafter Harvard Note].[4]

The superior court found that roof-mounted television antennae were one of a number of causes of leaking roofs. This finding has ample support in the record. The architect engaged by the Association to make recommendations as to what to do about the problem testified that television antennae caused problems on each of the twenty-two roofs in the condominium project.[5] Other problems causing the leaking were age of the condominiums, their poor design, and problems of poor workmanship which went into the construction

3. The O'Bucks, the Association, and the superior court each rely to some extent on *Carroll v. El Dorado Estates Division Number Two Ass'n*, 680 P.2d 1158 (Alaska 1984), to support their positions. In that case, we summarily rejected an argument that the declaration granted a right to pet ownership which could not be revoked by the bylaws. We noted that the provision in the declaration "was specifically made conditional and subject to change." *Id.* at 1162 n. 7. The Declaration in the instant case neither specifically grants nor specifically makes conditional a right to outdoor television antennae. Thus, *Carroll* has little if any bearing on this case. To the extent it applies, it shows that the O'Bucks have no vested property interest in maintaining their antenna, because any right to do so is subject to limitation or prohibition by the general regulatory provisions of the Declaration and Bylaws.

The O'Bucks also rely on *Winston Towers 200 Ass'n v. Saverio*, 360 So.2d 470 (Fla.App.1978). That case involved an attempted retroactive application of a rule banning pets and is plainly inapplicable to the instant case.

The O'Bucks also argue that the decision to adopt the rule was procedurally flawed. However, they do not cite any provisions of the Declaration or Bylaws, any statutes, or any common law rules that were violated. Instead, they rely on one case study from a book on condominium associations to argue that the process should have been more participatory. *See* D. Wolfe, *Condominium and Homeowner Associations that Work—On Paper and In Action* 81–84 (1978). In the absence of appropriate factual basis and legal authority to support their position, we reject this contention.

4. The Association urges an analogy to the business judgment rule of corporation law, which would require the court only to find that the Board's rule was a "good faith exercise of business judgment." Harvard Note, *supra*, at 664. This approach appears to be favored by what little commentary exists. *See id.* at 663–67. The O'Bucks resist this analogy, a position which is also supported by good authority. *See Johnson*, 505 A.2d at 1317 n. 7. However, it appears that there is little if any difference whether one uses the business judgment analogy in applying the reasonableness standard. *See* Harvard Note, *supra*, at 658–59, 667. The difference is certainly not material in this case, because the rule at issue measures up to any standard of reasonableness.

5. The O'Bucks mischaracterize the testimony of the architect in their brief, where they write, "Gregg Strom, the architect who inspected the roofs on the Board's behalf, testified that of approximately 100 antennae present on the roofs, only one of two [sic] might have caused problems." It is clear from the testimony cited that Mr. Strom testified only that he had described *with photographs on the witness stand* only one or two antennae that were causing problems. He clarified this point even further on the following page of testimony, where he explained that these few photos were merely for illustrative purposes to show the Board the types of problems they faced, and not to indicate that these were the only antennae causing problems.

of the condominium buildings. He also testified that it was important to limit foot traffic on the roofs, as many owners were apparently causing damage to the roofs when walking there to adjust their antennae. The repairs to the roof cost the Association $155,000. These facts clearly justified the Board's action to limit or prohibit television antennae and foot traffic on the roofs.

If the roof problems were the only justification for the rule, the O'Bucks would have a stronger argument that the rule was unreasonable. This is because they hired an architect who designed a method of installing antennae on the sides of the buildings rather than the roofs. This method would involve only brief work on the roof to connect the coaxial cable, and the rest of the work could be done from a ladder or hydraulically operated bucket. The availability of this relatively inexpensive alternative would cast some doubt on the reasonableness of a blanket prohibition on antennae if the only purpose of the rule was to protect the roofs.

However, it is clear that other legitimate considerations also motivated the antenna ban. As discussed above, the Declaration specifically authorized the prohibition of modifications or decorations to preserve a uniform exterior appearance to the buildings. Numerous witnesses testified that the Board was influenced by the unsightliness of the antennae. It was estimated that each of the 104 units in the twenty-two buildings had an antenna protruding from the roof. Witnesses testified that the Board felt that the elimination of the forest of antennae combined with the availability of a state-of-the-art cable system would enhance the marketability of the units. This evidence is adequate to support the superior court's conclusion that aesthetics and improved marketability were grounds for the antenna ban.

It is clear that the O'Bucks do not agree that the antenna ban improved the exterior appearance of the buildings. They describe this goal as "[nothing] more than a sop to personal prejudice or unarticulated personal values." However, this is a facet of the freedom they sacrificed when they bought into a condominium association. As one court put it:

> [I]nherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic sub-society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization.

*Hidden Harbour Estates,* 309 So.2d at 181–82, *quoted in Johnson,* 505 A.2d at 1317. We agree that condominium owners consciously sacrifice some freedom of choice in their decision to live in this type of housing. Unit owners may not rely on the courts to strike down reasonable rules on the grounds of differences in aesthetic tastes.

In evaluating the reasonableness of a condominium association rule, it is necessary to balance the importance of the rule's objective against the importance of the interest infringed upon. In a case where a rule seriously curtails an important civil liberty—such as, for example, freedom of expression—we will look with suspicion on the rule and require a compelling justification. The antenna ban in the instant case curtails no significant interests. The only loss suffered is that the O'Bucks and the other owners must now pay a small monthly fee to receive television, and even this cost is offset to a degree by the savings from the lack of need to install and maintain an antenna. In some cases, we might consider a financial burden to be an important interest. However, the fee in this case is small in view of the wherewithal of the members of the Association.[6] For this reason, we find that the interests of the Association in improving the exterior appear-

6. The units were advertised at a cost of $97,000 in 1981.

ance of the buildings and enhancing the marketability of the units more than adequately justify the small financial burden placed on the owners.

### C. Were the O'Bucks Entitled to an Easement for Installation and Maintenance of Their Antenna?

The O'Bucks claim that they have an easement which entitles them to install a television antenna on the roof. They offer three alternative theories by which they have obtained an easement: express, statutory grant under AS 34.07.170; easement by implication; and easement by estoppel. After considering the arguments in support of each of the theories, we conclude that the O'Bucks are not entitled to an easement to install an antenna.

### 1. Express statutory easement.

■ The O'Bucks argue that they are entitled to their own installed antenna under AS 34.07.170, which provides:

Each apartment owner has a nonexclusive easement for, and may use the common areas and facilities in accordance with the purpose for which they were intended without hindering or encroaching upon the lawful right of the other apartment owners.

The roof of each condominium building is specifically designated a common area in article V, section 2 of the Declaration. The O'Bucks claim that because the antenna was a use "for which [the roof was] intended" and because it does not "hinder ... or encroach upon the lawful right of the other apartment owners," they have an easement to install the antenna on the roof. We disagree. The superior court found, based on the testimony of several witnesses that the presence of television antennae on the roofs caused damage and leaks. The damage to the roofs led to the assessment of

nearly $1,200 repair costs to each owner. Because the court below could reasonably have considered this cost to be an encroachment upon or hinderance of each unit owner's lawful right to have a good roof as a common area, we affirm its ruling that the O'Bucks do not have an express easement to install a television antenna under AS 34.07.170.[7]

### 2. Implied easement.

■ The O'Bucks rely on *Freightways Terminal Co. v. Industrial and Commercial Construction, Inc.,* 381 P.2d 977 (Alaska 1963) in support of their claim for an easement by implication. They claim that they have met the requirements articulated in *Freightways:* that an implied easement would "give effect to the actual intent of the parties as shown by all the facts and circumstances," *id.* at 983, and that an implied easement is "reasonably necessary for the beneficial enjoyment of the property as it existed when the severance was made." *Id.* at 984. We are not persuaded that those requirements have been satisfied.

When the O'Bucks purchased their condominium unit, they received a deed that incorporated the Declaration by which the Association was empowered to regulate common areas in Cottonwood Village. Given this deed with its reservation of regulatory power to the Association, the O'Bucks' claim that an easement by implication would "give effect to the actual intent of the parties" to the conveyance rests on a questionable foundation.

The O'Bucks' claim that an implied easement is reasonably necessary for the beneficial enjoyment of the property as it existed when the severance was made is similarly untenable. While it is conceded that at the time the O'Bucks purchased their unit adequate television reception required an

7. *See also* our discussion in Part B, *supra.* There we conclude that the Board acted reasonably and within its authority under the Declaration and Bylaws in asserting "the lawful right of other apartment owners" to ban antennae.

The O'Bucks' attempt to avoid encroaching on other owners' rights in the common roof by installing their antenna on the wall fails under

the statute. Although a wall-mounted antenna would not contribute to leaking roofs, the-mounting of antennae is not a "purpose for which [the walls] were intended," as no antennae had been so mounted, and therefore does not give the O'Bucks an easement under AS 34.07.170.

antenna, it is not clear that a "need" for adequate television can ever rise to the level of necessity.[8] Case law and commentary indicate that the degree of necessity required for an easement by implication exceeds that shown by the O'Bucks.

In *Freightways* the plaintiff owned a landlocked parcel, and had no means of ingress or egress except via an easement over adjoining parcels. Similarly, the *Restatement of Property*, § 476 comment g (1944) notes that "[i]f *no use* can be made of land conveyed ... without the benefit of an easement, it is assumed that the parties intended the easement to be created.... It is assumed that the parties could not have intended that the land ... be useless...." (Emphasis supplied.) In such situations it seems clear that the owner of the landlocked parcel required an implied easement in order to preserve any value in the property. *But see Porter v. Griffith*, 25 Ariz.App. 300, 543 P.2d 138 (1975) (easement to owners of landlocked parcel denied). Because these cases reveal a level of necessity far beyond that shown by the O'Bucks, we affirm the superior court's holding that there is no easement by implication in the circumstances of this case.

### 3. *Easement by estoppel.*

■ The O'Bucks' third argument is that they gained an easement by estoppel. Again, they rely on *Freightways* to support their position:

> In case there is an attempted oral grant of an easement and the intended grantee makes improvements for the purpose of exercising the easement, equity will recognize and enforce the easement on the theory of what is ordinarily referred to as that of part performance but which is essentially the theory of estoppel.

381 P.2d at 984. The O'Bucks characterize the assurances they received from the developer before they purchased their unit as "an attempted oral grant," and argue that they relied upon that attempted oral grant in purchasing their unit and in purchasing and installing their antenna. They also argue that "an interest in property ... cannot be affected by a contrary house rule of the Association."

While the O'Bucks would not have purchased their unit without the developer's assurance that they could install an antenna, their intent in installing the antenna obviously was to improve their television reception. With the removal of their antenna, their reception suffered, but the Association offered the option of participating in a cable service which would provide reception at least as good as that provided by the antenna.

The additional cost of the cable system presents an inconvenience for the O'Bucks, who had invested in a "top-of-the-line antenna"[9] to insure free, high quality reception. Nonetheless, cable preserves their ability to obtain television reception in their unit. Such provision of an alternative undermines the O'Bucks' argument for an easement. *See Restatement of Property*, § 476 comment g, at 2984.[10]

The O'Bucks also contend that because their alleged easement is an interest in property, and "interests in property ... cannot be affected by a contrary house rule of the Association," they are entitled to install their antenna. The O'Bucks' assertion overstates the sanctity of interests in property. Indeed, in their trial brief below, the O'Bucks contended only that interests in property may be reasonably regulated but not nullified. Because we have held that the Board acted reasonably and was within its power to regulate common areas,

---

**8.** The record makes clear that television reception is of far greater importance to the O'Bucks than it is to most persons.

**9.** The O'Bucks were reimbursed by the Association for the remaining value of their antenna when it was removed. This presents a problem of self-reimbursement (the Association's money comes from the owners, such as the O'Bucks) but the Association has stated that it will seek reimbursement from the roofer who removed and damaged the antennae.

**10.** While the additional cost to the O'Bucks to insure continued high quality reception makes the cable system a less attractive alternative for them, we decline to hold that this circumstance gives them the right to reinstall their antenna in order to avoid the extra cost.

*see* Part B, *supra,* the O'Bucks' "interest in property" could be "affected." Further, the O'Bucks were compensated for the antenna which was removed. *See supra* note 9. Thus no property interest of the O'Bucks was nullified. We therefore affirm the superior court's decision that the O'Bucks do not possess an easement by estoppel.

Because the O'Bucks have not shown that they are entitled to an easement for their television antenna under any of the three theories they have advanced, we affirm the holding of the superior court that the O'Bucks do not possess an easement for the installation and maintenance of their antenna.

D. *Did the Court Below Abuse Its Discretion by Awarding Nearly 80% of Total Attorney's Fees to the Association?*

The lower court awarded $8,000 of the total of $10,128 claimed attorney's fees to the Association. The O'Bucks argue that this represents substantially all of the total fees incurred and thus constitutes an abuse of discretion. The O'Bucks assert that they are public interest litigants and should be immune from an award of attorney's fees under *Sisters of Providence v. Department of Health,* 648 P.2d 970 (Alaska 1982). They also argue that the facts of this case do not justify so high an award of attorney's fees.

 The O'Bucks' claim that they have pursued this litigation in the public interest is not credible. Their interest was and is private—they do not want to pay for cable television. The record belies their claim to represent the interests of "the 103 other owners in Cottonwood Village whose rights have been abrogated." At most, "some half dozen" or "several" of the 103 owners opposed the removal of antennae and replacement by cable televisions. This litigation seeks only to preserve the O'Bucks' ability to get free reception on three of their four televisions. Because the O'Bucks clearly had "sufficient private economic reasons to litigate" this case, *Sisters of Providence,* 648 P.2d at 986, they do not qualify as public interest litigants and are therefore not exempt from an award of attorney's fees.

Award of attorney's fees to the prevailing party is committed to the broad discretion of the trial court. Alaska R.Civ. P. 82(a); *Dale v. Greater Anchorage Area Borough,* 439 P.2d 790, 793 (Alaska 1968). We have previously stated that this court will not interfere with a trial court's exercise of discretion in awarding attorney's fees unless the court has abused its discretion. Such an abuse occurs where the award is manifestly unreasonable. *Palfy v. Rice,* 473 P.2d 606 (Alaska 1970). *See also Norris v. Gatts,* 738 P.2d 344 (Alaska 1987); *Tolstrup v. Miller,* 726 P.2d 1304 (Alaska 1986) (Supreme Court will not reverse award of attorney's fees unless manifestly unreasonable, arbitrary or awarded for a purpose other than justly deserved compensation); *Fairbanks Builders v. Sandstrom Plumbing and Heating,* 555 P.2d 964 (Alaska 1976).

The award of attorney's fees to the condominium association in this case was not manifestly unreasonable. We therefore decline to interfere with the trial court's exercise of discretion, and affirm the award of attorney's fees.

AFFIRMED.