**Donald W. DUNLAP, Appellant,**

v.

**BAVARIAN VILLAGE CONDOMINIUM ASSOCIATION, INC., Appellee.**

No. S–2452.

Supreme Court of Alaska.

Sept. 29, 1989.

Rehearing Denied Oct. 20, 1989.

Donald W. Dunlap, Anchorage, pro se.

David Rankine, Law Offices of William L. McNall, Anchorage, for appellee.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Justice.

I. BACKGROUND.

This case presents a challenge to the validity of a rule enacted by Bavarian Village Condominium Association ("the Association"), a non-profit owners' association. The Association has sought to enforce the rule against Donald W. Dunlap, one of the members of the Association.

**1.** Declaration of Condominium Ownership, art.

Bavarian Village is a 32–unit condominium development in east Anchorage. Dunlap has owned one of the units since 1981. Each unit has its own space in a carport, which, in condominium law parlance, is a "limited common area," reserved for the assigned owner's exclusive use, but subject to regulation by the Association.[1] Although each carport space was apparently designed to accommodate only one vehicle, the Association has permitted owners to park two vehicles in their designated spaces. In his carport Dunlap keeps a 1972 Blazer, which he drives to work, and a 1968 Mustang, which he brought with him when he moved to Bavarian Village in 1981. Dunlap purchased the Mustang, which he maintains is a "classic" car, as an investment. The Association, or at least some of its officers, maintain that it is a "junk" car.

In November 1984, Bavarian Village's managing agent wrote Dunlap as follows:

Please be advised that the Board of Directors of Bavarian Village Condominiums have [sic] decided that the Mustang parked in the carport area is an abandoned vehicle. Please remove this vehicle from the association's grounds within 20 days from the date of this letter. If the vehicle is not removed within 20 days then the association will have it removed at your expense.

Dunlap told the managing agent that the Mustang was not abandoned, and the Association took no further action regarding the Mustang until 1986.

On February 13, 1986, the Association's board of directors ("the Board") adopted a set of House Rules which took effect on April 1, 1986. Homeowners Obligation Number 8 addressed parking at Bavarian Village. Section (A) of the rule codified the prior practice of permitting owners to keep two vehicles in each carport space. Section (C) [hereinafter "House Rule 8(C)" or "the Rule"] provided:

No vehicle shall be stored on the premises. A vehicle shall be considered a stored vehicle unless it is driven on a public street at least once within a 60 day

II, § 6 [hereinafter "D. of C."].

period while properly licensed and insured.

The validity of this rule is the subject of the instant litigation.

On June 19, 1986, Bavarian Village's managing agent wrote Dunlap as follows:

It has been brought to my attention that you are storing an inoperable vehicle on the association property. Please be advised that if the vehicle is not removed within one week of receipt of this notice the association will have the car removed at your expense.

Dunlap, asserting that the Mustang was not and had never been inoperable, refused to comply with this directive, and the managing agent ordered the Mustang towed. The tow truck driver refused to take the vehicle, allegedly because Dunlap, who was present when the driver arrived, protested that he would report that the vehicle had been stolen. The managing agent then contacted Dunlap's attorney to try to resolve the issue. At the next board meeting, held on July 17, the Board "decided to allow Mr. Dunlap's attorney 10 days to get Mr. Dunlap to comply with the rules."

On August 21, 1986, the Board directed the managing agent to file suit for an injunction directing Dunlap to remove his vehicle. The Association filed its complaint and Dunlap answered through counsel, alleging that the enactment of House Rule 8(C), and its enforcement against him, constituted racial discrimination. He also counterclaimed for $25,000 in damages for intentional infliction of emotional distress. In his trial brief and at trial, Dunlap additionally asserted that House Rule 8(C) was adopted and then enforced against him in an arbitrary manner. Dunlap's counterclaim was withdrawn on the day of trial.

After a bench trial the superior court orally issued findings of fact and conclusions of law which were subsequently confirmed by a written order. The superior court held that House Rule 8(C) had been properly promulgated and found "no indication" to support Dunlap's claim of arbitrary or selective enforcement of the Rules.

The superior court then found that the underlying objective of House Rule 8(C) was to prevent "junk cars [from] being stored in the carport," and thereby "maintain[ ] the value and appearance of the condominium property," which it held was a proper purpose of the Association. The court noted that House Rule 8(C) wasn't "the most direct approach to the problem," but held that it bore "a reasonable relation[ship] to [the Association's] objective":

They made a connection between whether an owner has sufficient interest in the car to keep it licensed and to keep it insured and to make sure it's still operable. That those are three considerations that are going to go into the degree of maintenance of a car, and that a car that is not licensed or insured or is not driven on a somewhat regular basis, is more likely to be a junk car than a car that does not meet those criteria.

The court explicitly refused to find that Dunlap's Mustang was a junk car or would ordinarily be considered a junk car. Finally, noting that "it may be in some sense an unfortunate application in this particular case," the superior court held that House Rule 8(C) had a rational basis, and was not "arbitrary in light of the proper purposes of the condominium association." Final judgment enforcing House Rule 8(C) by enjoining Dunlap from "storing a vehicle," as defined by House Rule 8(C), at Bavarian Village was issued. The Association was also awarded $3,471 in attorney's fees and $554 in costs.

Dunlap appeals from this final judgment.

## II. THE PROPRIETY OF INJUNCTIVE RELIEF.

The Association's governing documents give it power to maintain an action for injunctive relief.[2] Alaska's Horizontal Property Regimes Act[3] gives the board of directors of a condominium association standing to maintain an action for injunc-

---

**2.** D. of C., art. VIII, § 2(b).

**3.** Alaska Statute 34.07.010–34.07.460.

tive relief in order to enforce strict compliance with condominium rules.[4]

Contrary to Dunlap's assertion, the court made adequate findings of fact and conclusions of law as required by Civil Rule 52(a) to warrant injunctive relief under AS 34.-07.360.[5] The superior court found that House Rule 8(C) was validly promulgated, was not invalid on its face or as might be applied, and was being violated by Dunlap. These findings and conclusions were sufficient. Furthermore, the court need not have found irreparable injury or lack of an adequate remedy at law, the traditional bases for injunctive relief, because AS 34.-07.360 specifically authorizes injunctive relief.[6]

■ Dunlap's assertion that the superior court failed to set forth the reasons for the injunction as required by Civil Rule 65(d) is also incorrect. In response to a similar assertion, the Ninth Circuit Court of Appeals ruled that the corresponding federal rule, by its terms,

> relates exclusively to the "order granting an injunction" in its requirement of a

statement of "the reasons for its issuance." Here the requirement was met. The order for the injunction [in the instant case, the court's order of August 20, 1987]—as distinguished from the injunction proper [which was contained in the final judgment, dated September 8, 1987]—is embodied in the court's Finding of Fact and Conclusion of Law [delivered orally on August 19, 1987] and therein appear the reasons for its issuance.[7]

"As a general rule, when the court's findings of fact and conclusions of law are sufficient to meet the requirements of Rule 52(a), they, almost of necessity, also state reasons for the injunction's issuance that are sufficient to satisfy Rule 65(d)." [8]

## III. THE ISSUE OF ARBITRARY OR SELECTIVE ENFORCEMENT.

Dunlap challenges the superior court's finding that the Association had not acted arbitrarily or selectively in enforcing its House Rules in general, or in specifically enforcing House Rule 8(C) against Dunlap.[9]

---

4. Alaska Statute 34.07.360 provides:
   *Strict compliance with bylaws by apartment owner necessary.* Each apartment owner shall comply strictly with the bylaws and with the adopted administrative regulations, as either may be lawfully amended from time to time, and with the covenants, conditions, and restrictions set out in the declaration or in the deed to the apartment. *Failure to comply* with any of the foregoing *is ground for* an action to recover sums due for damages or *injunctive relief,* or both, maintainable by the manager or board of directors on behalf of the association of apartment owners or by a particularly aggrieved apartment owner. (Emphasis added.)

5. Civil Rule 52(a) provides in part:
   [I]n granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the ground for its action.
   Alaska R.Civ.P. 52(a).

6. *Carroll v. El Dorado Estates Division Number Two Ass'n, Inc.,* 680 P.2d 1158, 1160 (Alaska 1984) ("Where a statute specifically authorizes injunctive relief, the plaintiff need not show either irreparable injury or lack of an adequate remedy at law.").

7. *Hunter v. United States,* 388 F.2d 148, 155 n. 6 (9th Cir.1967). *See also* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2955, at

539 (1973). Federal Rule of Civil Procedure 65(d) is identical to Alaska Rule of Civil Procedure 65(d). Civil Rule 65(d) provides:
   *Form and Scope of Injunction or Restraining Order.* Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained: and is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

8. Wright & Miller, *supra* note 7, at 540 (citing *Ross–Whitney Corp. v. Smith Kline & French Laboratories,* 207 F.2d 190, 198 (9th Cir.1953)).

9. This finding involves mixed issues of law and fact. The superior court's factual findings "should be overturned only if clearly erroneous. Whether the facts of the case ... [support the conclusion that the House Rules were not arbitrarily or selectively enforced] is subject to *de novo* review." *State v. Garcia,* 752 P.2d 478, 480 (Alaska App.1988). *See also Korte v. Employment Security Dep't,* 47 Wash.App. 296, 734 P.2d 939, 943 (1987); *LaGrand Steel v. A.S.C. Constructors, Inc.,* 108 Idaho 817, 702 P.2d 855, 856 (App.1985).

■ The record amply supports the superior court's finding that the Association enforced its House Rules generally.[10] The Association's contention that "for every example of a violation that Dunlap could point to, the board could point to a letter or other action taken by it which eliminated the violation" finds substantial support in the record.

Dunlap's claim of selective enforcement relies heavily on the fact that an engineless vehicle remained in another owner's carport space for more than six months. The record shows that the Association wrote the owner about the vehicle three times, permitted it to remain in the carport space under the impression that it was being repaired, and eventually gave the owner 14–days' towing notice. The record also shows that the Association requested the removal of two other "stored" vehicles.

Dunlap's best claim of discriminatory enforcement is that the Association gave him only 7 days' towing notice, in comparison to 14 days' notice to two other owners and no immediate threat of towing against the third owner. However, there is no evidence that this shorter notice period was imposed in bad faith.

**10.** For example, the Association enforced its rules concerning pets, storage of items on decks, and parking or driving on the grass.

**11.** *O'Buck v. Cottonwood Village Condominium Ass'n, Inc.*, 750 P.2d 813, 817 (Alaska 1988). *See also Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180 (Fla.App.1975). In that case, the Florida court noted in part:

[I]nherent in the condominium concept is the principle that to promote the health, happiness, and peace of mind of the majority of unit owners since they are living in such close proximity and using facilities in common, each unit owner must give up a certain degree of freedom of choice which he might otherwise enjoy in separate, privately owned property. Condominium unit owners comprise a little democratic subsociety of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization.

*Id.* at 181–82.

**12.** 750 P.2d 813 (Alaska 1988).

**13.** Both at trial and in its brief, the Association advanced other reasons for enacting House

The above facts are supported by the record. Furthermore, these facts establish that the Association did not act arbitrarily or selectively in enforcing its House Rules. Thus, we affirm the superior court's finding that the House Rules were not arbitrarily or selectively enforced against Dunlap.

## IV. THE ISSUE OF THE REASONABLENESS OF HOUSE RULE 8(C).

■ The outcome in this case comes down to a determination whether House Rule 8(C) is reasonable or not. A condominium regulation must be reasonable to withstand judicial scrutiny.[11] Each case must be evaluated on its own peculiar facts and circumstances. *Hidden Harbour Estates, Inc. v. Norman*, 309 So.2d 180 (Fla. App.1975).

The superior court, ruling prior to the issuance of *O'Buck v. Cottonwood Village Condominium Association*,[12] did not hold that House Rule 8(C) was "reasonable" *per se*. Rather, the superior court found that the Rule had a "rational basis," and that it bore a "reasonable relation[ship]" to the Association's legitimate purpose of "maintain[ing] the value and appearance of the condominium property" by avoiding the storage of junk cars in the carport.[13]

Rule 8(C), including making parking space more generally available, avoiding damage to the asphalt caused by depressions that develop in the surface over time when a car is parked in an identical position, and making it easier to sweep the asphalt. The superior court did not find these other possible reasons important or persuasive, and our review of the record leads us to the same conclusion.

Eliminating a stored automobile from an owner's carport space has absolutely no effect on alleviating any parking shortage because a carport space is a limited common area which no one but the owner to whom it is assigned can use without the owner's permission. As the court specifically observed in its findings and conclusions, depressions in the asphalt developed both in spaces where vehicles were "stored" and in carports where the vehicles were regularly being driven, and the Rule's effect on facilitating the sweeping of the asphalt is *de minimus* at best, given that the Association sweeps the asphalt only once a year, and that the sweeping is impeded by any vehicle parked in the carport, whether stored or not.

In *O'Buck* we evaluated a rule banning television antennae, and considered evidence that exterior appearance was improved by the elimination of 104 "unsightly" antennae from the roof, and that marketability was enhanced by the maintenance of a "uniform exterior appearance ... [and] the availability of a state-of-the-art cable system." [14] The financial burden imposed on the litigating owners was a small monthly fee for cable television. The Association offered to pay for the owners' cable hookup fee and the depreciated value of their antenna.[15] We concluded that "the interests of the Association in improving the exterior appearance of the buildings and enhancing the marketability of the units more than adequately justif[ied] the small financial burden on the owner." [16]

In the instant case, the Association raises the same "appearance and marketability" objectives that were considered legitimate in *O'Buck*. The enforcement of House Rule 8(C) serves these objectives to the extent that the removal of Dunlap's Mustang will [17] improve Bavarian Village's appearance and the marketability of its units. The parties disagree over whether the presence of Dunlap's Mustang in the carport has a detrimental effect on the appearance of Bavarian Village, and thus on the marketability of its units. However, in *O'Buck* we stated that "[u]nit owners may not rely on the courts to strike down reasonable rules on the grounds of differences in aesthetic tastes." [18]

In our view House Rule 8(C) is reasonable in that it bears a fair and substantial relationship to legitimate condominium purposes of improving aesthetics and marketability by eliminating junk cars. It was reasonable for the Association's governing body to conclude: that carport use should be restricted to operable, and not stored, junk vehicles; that if a unit owner desires to store a vehicle that the vehicle be stored off the Association's premises; and that the parking of operable vehicles should be restricted to carport areas. Admittedly, the controlling language of House Rule 8(C) will not result in the removal of all junk cars since it does not require the removal of a junk car if it is licensed, properly insured, and driven on a public street at least once every sixty days. Yet the reach of House Rule 8(C) is sufficiently closely tailored to its objectives so that we can state with a fair degree of assurance that it will eliminate the storage of "junk" vehicles in carport spaces. Since it bears a fair and substantial relationship to improving the aesthetics as well as the marketability of the Association's units, we conclude that House Rule 8(C) is a reasonable regulation.[19]

## V. ATTORNEY'S FEES.

■ Dunlap argues that the superior court should not have awarded costs and attorney's fees to the Association because the Association should not have prevailed, and that the superior court's award of almost 93% of the Association's costs and attorney fees was unwarranted.

The Association was awarded all of its eligible costs and 80% of its attorney's fees,

**14.** 750 P.2d at 818.

**15.** *Id.* at 814, 818.

**16.** *Id.* at 818–19.

**17.** Dunlap's Mustang is apparently still stored in his carport. From the time final judgment was issued until this court entered a stay on August 11, 1988, Dunlap apparently complied with the express provisions of House Rule 8(C) by registering, insuring, and driving his Mustang at least once every 60 days.

**18.** 750 P.2d at 818.

**19.** In *Holleman v. Mission Trace Homeowners Association*, 556 S.W.2d 632 (Tex.Civ.App.1977),

the court upheld a subdivision association regulation which banned the parking of vehicles overnight on the driveways leading to the unit owners' garages. In concluding that the regulation restricting overnight parking was in fact reasonable, the court said in part:

In the present case the Board of Directors are authorized to make reasonable rules pertaining to the common area in the Subdivision. Certainly, the Association is not at liberty to adopt arbitrary or capricious rules bearing no relationship to the health, happiness, and enjoyment of life of the various unit owners.

*Id.* at 636.

one percent more than this court upheld in *O'Buck*.[20] We do not believe that the superior court abused its discretion in awarding the Association $554 in costs and $3,471 in attorney's fees.

Bavarian Village requests full attorney's fees pursuant to Appellate Rule 508(e) on the basis that this appeal is frivolous. We disagree. This appeal is not frivolous.

AFFIRMED.