Connie S. **BENNETT and Good Taste, Inc., Appellants,**

v.

William **WEIMAR and Robert Cronen, Appellees.**

Nos. S–8410.

Supreme Court of Alaska.

April 9, 1999.

---

Thomas J. Yerbich, Law Office of Thomas J. Yerbich, Anchorage, for Appellants.

Michael W. Price and Sabrina E.L. Fernandez, Price & Price, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE, and BRYNER, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Board members and officers of a condominium association owe a fiduciary duty to

the condominium owners. Courts, however, generally do not substitute their judgment for condominium association officers' decisions unless they are unreasonable. Connie Bennett owns two units in a condominium complex. William Weimar and Robert Cronen hold office in and have voting control of the condominium association. Bennett alleged that Weimar and Cronen breached their fiduciary duties by remodeling and landscaping the building's common areas, and by allowing one unit to be used as a coffee shop. She also claimed that they thwarted the sale of her units. Because Bennett has produced no admissible evidence showing that a genuine issue of material fact remains, we affirm the superior court's grant of summary judgment to Weimar and Cronen.

## II. FACTS AND PROCEEDINGS

The 600 Barrow Condominiums contain six residential and three commercial units. Connie Bennett, a former president of the condominium owners' association board of directors, owns residential Units C and F, personally and as the owner of Good Taste, Inc. (GTI). William Weimar, the current president of the association, owns residential Units A and B. Weimar is also the owner of St. Johns Investments, Inc., which owns the two largest commercial units (Units 2 and 3). Robert Cronen is the secretary and treasurer of both St. Johns Investments and the association. The relative value of each unit determines its owner's voting power in the association. The value of Weimar's units gives him sufficient voting power to control the decisions of the association's board of directors.

An amendment to 600 Barrow's conditions, covenants, and restrictions (CC & Rs), recorded in 1994 during Bennett's presidency, prohibited use of the commercial units as restaurants or food stores. In March 1995 Weimar became president, and Weimar and Cronen (hereinafter collectively Weimar) gained control of the association. The board approved using a commercial unit as a coffee shop. Sometime after approval, counsel to the board advised it that the 1994 amendment was invalid and unenforceable. The

board, under Weimar, also approved expenditures exceeding $40,000 to remodel common areas and re-landscape common grounds.

Bennett and GTI have tried to sell their units. Bennett placed her units on the market in June 1995, but has been unable to sell them.

Bennett sued Weimar and Cronen individually, challenging various actions taken by Weimar in his capacity as director and officer of the association. Bennett did not sue the association. She alleged that Weimar breached his fiduciary duty to the owners by holding meetings without proper notice, approving plans for use of a commercial unit in violation of the CC & Rs, incurring unauthorized expenses, making unnecessary improvements to the common areas of the building, and failing to maintain the association's records according to the bylaws. Bennett maintained that Weimar's actions reduced the value and marketability of her units. She also alleged that Weimar deliberately made false statements to prospective buyers of Bennett's units, thereby preventing their sale. Bennett sought compensatory and punitive damages.

Weimar moved for summary judgment. The superior court noted that Weimar supported his motion "with numerous exhibits, including properly sworn and notarized affidavits, to show that there were no disputed issues of material fact."

Bennett opposed Weimar's motion, relying primarily on a non-notarized declaration. The declaration did not state that a notary was unavailable. The superior court concluded that, under Alaska Civil Rule 56, it could not consider Bennett's declaration in ruling on Weimar's motion. The superior court found no genuine issues of material fact regarding Bennett's claim of breach of fiduciary duty or intentional interference with prospective economic advantage. It granted summary judgment to Weimar, denied Bennett's motion for reconsideration, and entered judgment for Weimar.

Bennett appeals, arguing that the superior court erred in disregarding her declaration and in "determining that as a matter of law

the actions of [Weimar] were not unreasonable."

## III. DISCUSSION

### A. Standards of Review

We review a grant of summary judgment de novo.[1] Summary judgment is appropriate if "the evidence in the record fails to disclose a genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[2]

██ We review a lower court's decision to admit or exclude evidence for abuse of discretion.[3] We find an abuse of discretion only when left with "a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[4]

### B. Summary Judgment Materials

#### 1. Bennett's declaration

Bennett argues that the superior court improperly disregarded the declaration she submitted in response to Weimar's summary judgment motion. Weimar responds that the superior court correctly refused to consider the declaration because it was not notarized, did not state that a notary was unavailable, and, therefore, did not meet the statutory requirements of an affidavit. Weimar also argues that, even if the declaration had been admitted, it would not have prevented summary judgment because it contains no admissible evidence creating a genuine issue of material fact.

1. See Ramsey v. City of Sand Point, 936 P.2d 126, 129 (Alaska 1997).

2. Dayhoff v. Temsco Helicopters, Inc., 848 P.2d 1367, 1369 (Alaska 1993) (quoting Dayhoff v. Temsco Helicopters, Inc., 772 P.2d 1085, 1086 (Alaska 1989)).

3. See Williams v. Utility Equip., Inc., 837 P.2d 1112, 1115 (Alaska 1992).

4. Peter Pan Seafoods, Inc. v. Stepanoff, 650 P.2d 375, 378–79 (Alaska 1982).

5. Alaska R. Civ. P. 56(c).

6. Id.

7. Alaska R. Civ. P. 56(e).

8. Jennings v. State, 566 P.2d 1304, 1309–10 (Alaska 1977).

The superior court reasoned that Alaska Civil Rule 56 does not "allow· a court to consider a non-notarized written statement such as the Declaration of Connie S. Bennett."

Rule 56(c) emphasizes the importance of affidavits, as opposed to unsworn allegations, with regard to summary judgment. It provides that a summary judgment motion "may be supported by affidavits setting forth concise statements of material facts made upon personal knowledge."[5] The party opposing summary judgment "may serve opposing affidavits, a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, and any other memorandum in opposition to the motion."[6] When a party has made and properly supported a summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."[7] Therefore, "assertions of fact in unverified pleadings and memoranda cannot be relied on in denying a motion for summary judgment."[8] Alaska Statute 09.63.010 lists persons who may witness an affidavit.[9]

██ Alaska Statute 09.63.020(a) specifies how an equivalent document may be created when a notary public is unavailable.[10] Ben-

9. AS 09.63.010 provides:

Oath, affirmation, and acknowledgment. The following persons may take an oath, affirmation, or acknowledgment in the state:
(1) a justice, judge, or magistrate of a court of the State of Alaska or of the United States;
(2) a clerk or deputy clerk of a court of the State of Alaska or of the United States;
(3) a notary public;
(4) a United States postmaster;
(5) a commissioned officer under AS 09.63.050(4); or
(6) a municipal clerk carrying out the clerk's duties under AS 29.20.380.

10. AS 09.63.020(a) provides:

A matter required or authorized to be supported, evidenced, established, or proven by the sworn statement, declaration, verification, certificate, oath, or affidavit, in writing of the

nett's declaration does not meet the requirements of that statute because it does not assert that a notary or other authorized official was unavailable. We conclude that Bennett's declaration does not satisfy the requirements of Rule 56 or AS 09.63.020(a).

Bennett argues that, when deciding whether to grant summary judgment, courts may treat a nonmoving party's papers more leniently than the moving party's papers. Bennett asserts, "[c]ourts have even accepted verified pleadings as well as declarations as being the functional equivalent of an affidavit in opposition to a motion for summary judgment."

Federal courts may treat verified pleadings as equivalent to affidavits, if the verified complaint "is based on personal knowledge and sets forth facts admissible in evidence and to which the affiant is competent to testify." [11] We have also allowed parties to rely on verified pleadings in opposing summary judgment.[12] Verified documents, however, are prepared under oath and are sworn and signed "before a person authorized by law to take the person's oath or affirmation." [13] Therefore, verified and notarized documents satisfy the same basic requirements.[14]

Bennett also urges us to consider her declaration because she made it "under penalty of perjury." She reasons, "It seems incongruous for the rules to be such that a person could be convicted of perjury for making a statement in the manner Bennett did in this case, and yet that same statement is not sufficient evidence to support a civil action."

Federal courts permit unsworn declarations in lieu of affidavits if the declarations are signed under penalty of perjury.[15] Congress passed 28 U.S.C. § 1746, allowing such declarations, after finding that "[t]he requirement that the person who signs an affidavit must appear before a notary and be sworn can be inconvenient." [16] Congress found that documents might have to be executed outside normal business hours when a notary is unavailable.[17] And, for documents executed outside the United States, it found that notarization might pose additional problems regarding the authority of the officer administering the oath and the authenticity of the officer's seal.

Our statutes, however, contain no analogous provision permitting unsworn declarations in lieu of affidavits. In AS 09.63.020(a), our legislature has provided an exception to the notarization requirement when a notary is unavailable. If a notary is available, sworn affidavits are required. If a notary is unavailable, a document satisfying AS 09.63.020(a) is required. The requirement that the party appear before a notary public or other person authorized by AS 09.63.010 to administer an oath (assuming one is available) to swear the truth of a document's contents is potentially more effective at producing truth during motion practice than the threat of discretionary prosecution for perjury. A notary also requires the affiant to produce identification before the notary signs

person making it (other than a deposition, an acknowledgment, an oath of office, or an oath required to be taken before a specified official other than a notary public) may be supported, evidenced, established, or proven by the person certifying in writing "under penalty of perjury" that the matter is true. The certification shall state the date and place of execution, the fact that a notary public or other official empowered to administer oaths is unavailable, and the following: "I certify under penalty of perjury that the foregoing is true."

**11.** *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir.1985); *see also McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir.1987).

**12.** *See e.g.*, *Smith v. Thompson*, 923 P.2d 101, 102 n. 1 (Alaska 1996); *Wettanen v. Cowper*, 749 P.2d 362, 363 (Alaska 1988).

**13.** AS 09.63.040(a), (b).

**14.** *See* AS 09.63.030, .020.

**15.** *See* 28 U.S.C. § 1746. *See also Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l Inc.*, 982 F.2d 686, 689–90 (1st Cir.1993) ("Under federal law, an unsworn statement signed under penalty of perjury may be used, in lieu of a sworn statement or affidavit, to support or oppose a motion for summary judgment."); *Davis v. Frapolly*, 756 F.Supp. 1065, 1067 (N.D.Ill.1991).

**16.** H.R.Rep. No. 94–1616, at 1 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5644, 5645.

**17.** *See id.*

and seals the document.[18] Absent legislative requirement that we do so, we are not willing to equate an unsworn declaration with an affidavit for purposes of summary judgment proceedings. This is an additional safeguard which we wish to retain.

Finally, we must decide whether Weimar timely objected to the form of Bennett's declaration. Weimar first challenged the procedural sufficiency of the declaration at oral argument on the summary judgment motion. Weimar had previously treated the declaration as an affidavit. Because Weimar first raised this issue at oral argument, the superior court was not compelled to hold that the unsworn declaration was insufficient. But Bennett never submitted a corrected document. Any possible error on the part of the superior court in failing to give Bennett an opportunity to supply an adequate document is made harmless by Bennett's failure to tender a document that conformed to the requirements of AS 09.63.010 or AS 09.63.020(a) when she moved for reconsideration, and by her failure to request additional time in which to supply a conforming document.

We conclude that Bennett's declaration is inadmissible, and that any error in rejecting it is harmless.

### 2. *Affidavits submitted by Weimar*

Bennett also raises a procedural challenge to the materials Weimar submitted when he moved for summary judgment. She asserts that the Glenn Stewart and Robert Cronen affidavits do not show that the affiants had personal knowledge of the facts.

She also argues that documents attached to Weimar's supporting memorandum were "neither sworn nor certified."

Bennett, however, acknowledges that she first raised this objection when she moved for reconsideration. Without deciding whether Weimar's materials are procedurally sufficient, we conclude that the superior court properly considered them because Bennett made no timely objection to them.[19]

### C. *Breach of Fiduciary Duty*

Bennett argues that Weimar breached his fiduciary duties to the association and its members. Although she asserts that the superior court applied the correct standard in judging Weimar's actions, she argues that it misapplied the standard; she raises several challenges to the reasonableness of Weimar's actions.

Weimar argues that Bennett could only have created a genuine issue of material fact with an affidavit "alleg[ing] facts rising to the level of fraud, dishonesty or incompetence." He contends that summary judgment on this issue was appropriate because, even with her declaration, Bennett introduced no evidence of fraud, dishonesty, or incompetence. The superior court granted summary judgment, explaining, "[Bennett] allege[s] that [Weimar's] decisions were unreasonable, but [she] fail[s] to proffer any evidence that would permit a trier of fact to conclude the expenditures were unreasonable under the permissive business judgment standard...."

We turn first to the standard by which the actions of condominium officers' are judged.[20] Bennett proposes a reasonableness standard.

---

18. *See* AS 44.50.070 ("A notary public shall require oaths and affirmations to be given in the notary's presence and require persons appearing before the notary to produce identification.").

19. *See Murat v. F/V Shelikof Strait*, 793 P.2d 69, 75 (Alaska 1990) (noting "the well-recognized principle that a failure to timely raise any evidentiary objection constitutes waiver of that objection and permits the court to consider the proffered evidence"). *See also* Alaska R. Civ. P. 77(k) (allowing a party to "move the court to reconsider a ruling *previously decided*" and requiring the movant to "specifically designate that portion of the ruling, the memorandum, or the record, ... which the movant wishes the court to consider") (emphasis added).

20. This is a subject of much debate. *See, e.g.,* Robert G. Natelson, *Consent, Coercion, and "Reasonableness" in Private Law: The Special Case of the Property Owners' Association,* 51 Ohio St. L.J. 41, 48 (1990) (noting that "individual courts and commentators have resorted to public law and constitutional standards, judicial review of the developer's exercise of reserved powers, trust law, and the laws of business corporations and housing cooperatives" for precedent to apply to property owners' associations); Note, *Judicial Review of Condominium Rulemaking,* 94 Harv. L.Rev. 647, 656–67 (1981).

She draws an analogy between condominium owners with voting control and directors or majority shareholders of a corporation. She argues that directors have a fiduciary duty to act in the best interests of the corporation, and to manage the corporation's affairs with "the same degree of care that an ordinary prudent person would use." She contends that Weimar, as an owner with voting control, breached those fiduciary duties to the other members of the association.

Weimar relies on *Papalexiou v. Tower West Condominium,*[21] which applies the business judgment rule to evaluate the actions of a board of directors of a condominium association. Under that standard, "[c]ourts will not second-guess the actions of directors unless it appears that they are the result of fraud, dishonesty or incompetence."[22]

The superior court found that Weimar's actions satisfied a "permissive business judgment standard," which appears similar to the reasonableness standard Bennett advances.

██ Alaska Statute 34.08.330(a) requires officers and members of the executive board of owners' associations "to exercise the care required of fiduciaries of the unit owners." Although AS 34.08.750 appears to allow the importation of the business judgment rule into the law of condominium associations,[23] we favor a standard that includes reasonable-

ness. In *O'Buck v. Cottonwood Village Condominium Association,*[24] we considered the application of the business judgment rule to condominium boards. We decided that "a condominium association rule will not withstand judicial scrutiny if it is not reasonable."[25] Noting the authority for and against application of the business judgment rule, we concluded, "there is little if any difference whether one uses the business judgment analogy in applying the reasonableness standard.... [T]he rule at issue measures up to any standard of reasonableness."[26] Similarly, in *Dunlap v. Bavarian Village Condominium Association,*[27] we applied a reasonableness test to a condominium rule against storing "junk" cars in carports. We concluded that the rule "bears a fair and substantial relationship to legitimate condominium purposes of improving aesthetics and marketability by eliminating junk cars."[28]

We must therefore decide whether there is a genuine issue of material fact about the reasonableness of Weimar's actions challenged by Bennett.

*1. The renovations*

██ Bennett contends that the board, with only $41,000 in reserves, imprudently spent $45,600 on renovations. She claims that the remodeling and landscaping raised her dues

**21.** 167 N.J.Super. 516, 401 A.2d 280, 285 (1979).

**22.** *Papalexiou,* 401 A.2d at 286. *See also Rywalt v. Writer Corp.,* 34 Colo.App. 334, 526 P.2d 316, 317 (1974) (concluding that courts should not interfere with acts of directors of homeowners' association absent evidence of bad faith or fraud); *Schwarzmann v. Ass'n of Apartment Owners,* 33 Wash.App. 397, 655 P.2d 1177, 1181 (1982) (holding that court would not second-guess actions of directors absent a showing of fraud, dishonesty, or incompetence, and that directors could not be held personally liable without a showing that they acted in bad faith or knowingly condoned wrongful or negligent conduct).

**23.** AS 34.08.750 provides:
The *principles of law* and equity, including the law of corporations and unincorporated associations, the law of real property, and the law relative to capacity to contract, principal and agent, eminent domain, estoppel, fraud, misrepresentation, duress, coercion, mistake, re-

ceivership, substantial performance, or other validating or invalidating cause *supplement the provisions of this chapter* except to the extent inconsistent with this chapter.
(Emphasis added.)

**24.** 750 P.2d 813, 817–18 & n. 4 (Alaska 1988).

**25.** *Id.* at 817.

**26.** *Id.* at 817 n. 4 (holding that the association's ban of television antennae was reasonable).

**27.** 780 P.2d 1012, 1016–17 (Alaska 1989).

**28.** *Id.* at 1017. *Accord, Thanasoulis v. Winston Tower 200 Ass'n,* 214 N.J.Super. 408, 519 A.2d 911, 912 (App.Div.1986) (stating that courts will not second-guess association's reasonable, good-faith acts), *rev'd on other grounds,* 110 N.J. 650, 542 A.2d 900 (1988); *Riss v. Angel,* 131 Wash.2d 612, 934 P.2d 669, 680–81 (1997) (requiring directors of homeowners' associations to act reasonably and in good faith).

by 250%, and decreased the value, marketability, and security of the building.

Weimar supported his summary judgment motion with a prima facie showing that the remodeling had a valid purpose. He submitted an affidavit from Cronen stating that the board of directors decided that the renovations were necessary "based on considerations of aesthetics, safety, security and the convenience of the homeowners. Alternatives were also considered." He also noted, and Bennett does not dispute, that "[a]ll expenditures for repair were made with approval from the board of directors in accordance with the By-laws."

■ Appearance and marketability are legitimate objectives for an association to pursue.[29] In *Dunlap* we concluded that the association's rule against storing junk cars in carports could be applied to Dunlap and his car, even though the parties "disagree[d] over whether the presence of Dunlap's Mustang in the carport ha[d] a detrimental effect on the appearance of [the complex]...."[30] Similarly, in *O'Buck*, the parties did not agree that the association's ban of exterior television antennae improved the appearance of the building.[31] The O'Bucks maintained that the ban was "[nothing] more than a sop to personal prejudice or unarticulated personal values."[32] But we explained that "condominium owners consciously sacrifice some freedom of choice in their decision to live in this type of housing. Unit owners may not rely on the courts to strike down reasonable rules on the grounds of differences in aesthetic tastes."[33]

Bennett's case is slightly different. Bennett challenges certain decisions by the association, not an association rule or ban. And Bennett sued Weimar and Cronen individually. But the reasoning of *O'Buck* and *Dunlap* still applies because, like the O'Bucks and

Dunlap, Bennett challenges judgments of aesthetics and marketability.

There was no evidence properly before the court to rebut the showing in the Cronen affidavit that the remodeling was done for a legitimate purpose. To prevent summary judgment, Bennett needed to provide more than her opinion that the renovations were unnecessary; she needed to present evidence showing that they were unreasonable. Bennett's strongest evidence of unreasonableness was the claim in her declaration that her dues increased 250%. But this is not admissible evidence. *See* Part III.B.1. Bennett's declaration also presented her opinion that the renovations only benefited Weimar's commercial units. Although Bennett implied that the renovations were unreasonable self-dealing by Weimar, she introduced no admissible evidence to support her theory.[34] We therefore affirm summary judgment on this issue.

### 2. *The coffee shop*

■ Bennett also argues that approving plans for the use of one unit as a coffee shop violated the CC & Rs and constituted a breach of fiduciary duty. She notes that an amendment to the CC & Rs prohibited the use of a commercial unit as a restaurant or food store. Cronen's affidavit states that the board allowed the coffee shop "[i]n reliance on a legal opinion as to the validity of an amendment to the By-laws." Bennett reasons that "[t]his opinion of counsel, unlike a decision of a court, binds no one and is just that, a mere opinion." She also notes, and Weimar acknowledged, that the board obtained the legal advice only after approving the opening of the coffee shop.

The superior court concluded that enforcement of the amendment to the CC & Rs "was not an option" because counsel advised the board that the amendment was invalid. The court also noted that Bennett "proffer[ed] no

---

**29.** *See Dunlap,* 780 P.2d at 1017; *O'Buck,* 750 P.2d at 818.

**30.** 780 P.2d at 1017.

**31.** *See* 750 P.2d at 818.

**32.** *Id.*

**33.** *Id.*

**34.** *See French v. Jadon, Inc.,* 911 P.2d 20, 24–26 (Alaska 1996) (affirming summary judgment against a nonmoving party who introduced opinions and speculation, but no admissible evidence, to rebut the moving party's sworn statements).

evidence that the initial approval and subsequent acquiescence of the coffee shop's operation [were] contrary to the interests of the Association or intended to personally benefit [Weimar]."

In support of his summary judgment motion, Weimar submitted the attorney's letter opining that the amendment relied upon by Bennett was invalid. The board could permissibly rely on that letter to decline to enforce the amendment. Bennett introduced no evidence that the board's refusal to enforce the amendment, after obtaining counsel's advice that it was invalid and unenforceable, was unreasonable. Bennett's attorney effectively conceded as much in oral argument before our court. We therefore affirm summary judgment on this issue.

### 3. Credit for fees and costs

Bennett also argues that the board did not "credit [her] with the $22,000 [in fees and costs] she expended for and on behalf of the Association ... in prosecuting lawsuits involving St. John [sic] Investments and defendants...." Weimar responds that this issue would be "more appropriately handled" in the lawsuit in which Bennett incurred the fees. The superior court did not decide this issue.

Bennett has waived this argument by inadequately briefing it on appeal. She cites no authority to explain her legal theory why Weimar is responsible in this case for fees incurred in another case or to suggest that a

factual issue remains.[35] We therefore decline to address this issue.

### 4. Intentional interference with prospective economic advantage

Finally, Bennett argues that Weimar intentionally interfered with possible sales of Bennett's units. Bennett concedes that, on the evidence it did consider, the superior court correctly concluded that Weimar did not interfere with Bennett's prospective sales. But she contends that her declaration establishes genuine issues of material fact on this question. Because we concluded above in Part III.B.1 that Bennett's declaration is inadmissible, her argument here necessarily fails. Given her concession, the insufficiency of her declaration, and her failure to argue that Weimar did not satisfy his initial burden of establishing the absence of genuine material factual issues and his entitlement to judgment as a matter of law, we affirm Weimar's summary judgment on this claim.[36]

## IV. CONCLUSION

Because there are no genuine issues of material fact regarding Bennett's claims, we AFFIRM the grant of summary judgment to Weimar and Cronen on all of Bennett's claims.

---

**35.** *See Adamson v. University of Alaska,* 819 P.2d 886, 889 n. 3 (Alaska 1991) ("Where a point is given only a cursory statement in the argument portion of a brief, the point will not be considered on appeal"); *State v. O'Neill Investigations, Inc.,* 609 P.2d 520, 528 (Alaska 1980).

**36.** *See* Alaska R. Civ. P. 56(c); *Yurioff v. American Honda Motor Co.,* 803 P.2d 386, 388–89 (Alaska 1990).