NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

KYLER B., )
                                   )
                 Appellant, )
                                     )
       v. )
                                       )
STATE OF ALASKA, DEPARTMENT )
OF FAMILY AND COMMUNITY )
SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
                 Appellee. )
_____ )
NIA T., )
                                     )
                 Appellant, )
                                     )
       v. )
                                       )
STATE OF ALASKA, DEPARTMENT )
OF FAMILY AND COMMUNITY )
SERVICES, OFFICE OF )
CHILDREN'S SERVICES, )
                 Appellee. )
                                     )
_____ )

Supreme Court Nos. S-18453/18456 (Consolidated)

Superior Court Nos. 4FA-19-00078/00080/00177 CN (Consolidated)

MEMORANDUM OPINION
AND JUDGMENT[*]

No. 1973 – June 21, 2023

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Brent E. Bennett, Judge.

Appearances: Katrina Larsen, Ketchikan, for Appellant Kyler B. Claire F. De Witte, Assistant Public Defender, and

_____

[*]      Entered under Alaska Appellate Rule 214.

Samantha Cherot, Public Defender, Anchorage, for Appellant Nia T. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Maassen, Chief Justice, Carney, Borghesan, and Henderson, Justices.

## I. INTRODUCTION

The superior court terminated parents' rights to three children. The parents appeal the termination order, arguing that the court improperly admitted a recorded interview in which one child disclosed a parent's sexual abuse, that without this recording there was insufficient evidence to find the children in need of aid, and that the Office of Children's Services (OCS) did not make reasonable efforts to reunify the family. The father also appeals the superior court's denial of his request for a continuance to accommodate his expert witness.

We see no abuse of discretion in the superior court's decisions to admit the recorded interview and to deny the continuance, and we conclude that OCS's reunification efforts were reasonable overall. We therefore affirm the termination order. And because there was no error in the admission of the recorded interview, we do not need to reach the parents' argument that without it there was insufficient evidence to support the child in need of aid (CINA) findings.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Background leading to OCS's involvement

Nia T. is the mother of Ophelia, born in 2014; Daxon, born in 2018; and Milo, born in 2019.[1] Kyler B. is Daxon and Milo's father. Ophelia's father is not involved in this appeal.

Nia and Kyler were both born and raised in Hawaii, where their relationship began in April 2017. In July 2017 Kyler, Nia, and Ophelia moved to Alaska, ultimately settling in Fairbanks, home to both Kyler's and Nia's parents. Nia had a strained relationship with her mother, Nicolette, and Nicolette's wife, Michelle, who would become the children's foster parents. According to Nia, the couple abused her physically and emotionally when she was a child.[2] Kyler has long maintained that he is blind as a result of "conversion disorder."[3]

OCS received several reports about Nia and Kyler beginning in 2018, but it did not become involved with the family until March 2019, when Nia's coworker reported hearing that Kyler had broken Daxon's leg. OCS sent a caseworker to interview the family. The caseworker later testified that she interviewed Ophelia, who reported that "sometimes her parents would get into disagreements" but "did not make

---

[1] We use pseudonyms for all family members to protect their privacy. Nia and Kyler also share a younger child, born in 2021. Their rights to this child are not at issue in this appeal.

[2] An OCS witness testified that because Nicolette and Michelle are currently foster parents, OCS investigated these allegations of abuse and determined that the couple were suitable foster parents for the children.

[3] Conversion disorder causes neurological symptoms, including impairment of the senses and blindness, "that can't be explained by a neurological disease or other medical condition." *Functional neurological disorder/conversion disorder*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197 (last updated Jan. 11, 2022).

any disclosures regarding her parents hitting each other." The caseworker did not interview Daxon, who was not yet verbal, but confirmed that he looked clean and healthy and behaved appropriately for his age, that Nia had provided a credible and innocent explanation for his broken leg, and that the leg had healed.

The OCS worker also testified, however, that Nia "disclosed that [Kyler] had hit her" a few weekends before. The worker testified that when she asked Kyler about the incident he neither confirmed nor denied hitting Nia, but when she asked how often they fought physically he responded that "it doesn't happen often and it's rare," which the worker interpreted as "a self-disclosure" of domestic violence in the home.

Following the visit OCS and the parents developed an in-home safety plan, naming Kyler's parents and Nia's mother as participants and ensuring that the parents would be separated and the police called if there was violence between them. OCS referred the parents to parenting courses, which they attended. OCS updated the safety plan twice and left it in effect until May 2019.

### 2. OCS's custody of the children

OCS sought temporary custody of Ophelia and Daxon in May 2019 following an incident when the police were called to the home. The children were removed and placed with Nicolette and Michelle. Milo was placed with them as well shortly after his birth in August 2019.

OCS drafted the parents' first case plans, referred them for psychological and parental risk assessments (which they completed), and set up visitation through a family reunification program operated by the Resource Center for Parents and Children (RCPC). Nia and Kyler consistently attended these visits, which generally went well. According to the visitation supervisors, however, the parents often became overwhelmed or used their visitation time and parenting classes to complain about OCS and the foster parents. Nia was discharged from the RCPC program in 2020 due to her

lack of progress, and Kyler was excluded from RCPC's premises following an accusation that he was a sex offender.

Visitation for both parents continued under OCS supervision, and caseworkers testified that visits generally went well for both parents. But the caseworkers also reported that the parents were difficult to work with and their emotions quickly escalated; although they completed some aspects of their case plans, they did not seem to acknowledge the problems in their relationship, deflecting responsibility instead. By the time of trial Nia had moved to off-site visits with the children, but a caseworker testified she did not believe the family was ready for a trial home visit due to lingering concerns with the parents' behaviors and the risk that the children would be mistreated.

### 3. Ophelia's interview at Stevie's Place

In early January 2020 Ophelia was interviewed at Stevie's Place Child Advocacy Center about a report that she had been sexually abused.[4] Ophelia told the interviewer that Kyler choked her, threw her on the bed and held her head down, spanked her underneath her clothes, and inappropriately touched her during a bath. The interviewer used dolls and anatomical drawings to help Ophelia explain what occurred.

The incident was alleged to have happened a year earlier, when Ophelia was four. According to the parties' counsel, Ophelia had been interviewed once before at Stevie's Place about an incident of sexual abuse, but specific evidence of that earlier interview was never introduced; the record does not indicate when it took place or whether it related to the same allegations.

Nia refused to believe what Ophelia reported in the Stevie's Place interview, which caused OCS concern that she would be unable to give Ophelia the

---

[4] The record does not reveal who made the initial report; Stevie's Place keeps such reports anonymous, and the interviewer did not know the source of the allegations.

appropriate support or "meet [Ophelia's] mental health needs." In September 2020 OCS filed a petition to terminate Kyler's and Nia's parental rights.

### 4. Kyler's threat to OCS

An OCS caseworker testified that in October 2020 Kyler called the office warning that OCS had "better get a SWAT team to the [foster family's] house and also that he was wanting a call ASAP from somebody in the upper management and that things were going to get violent." Deeming the call a terroristic threat, OCS instituted an emergency lockdown. Kyler was arrested. For some period thereafter Kyler was not allowed on OCS premises for visitation. He continued visitation telephonically before eventually being allowed to resume in-person visits.

### 5. The parents' relationship with OCS

Throughout the case's pendency, the parents actively participated in parts of their case plans. They completed some of the psychological evaluations to which OCS referred them as well as a number of parenting classes. They attended some portion of group or individual therapy and were consistent with visitation.

OCS referred Nia to two individual therapists, but she saw just one of them for a few sessions. When that therapist proved to be a poor fit, Nia discussed with the OCS caseworker the importance of her Native Hawaiian culture and said she had had success with a therapist in Hawaii. The caseworker asked Nia for the Hawaii therapist's name and contact information, which, according to the caseworker, Nia failed to provide. It does not appear that OCS referred her to anyone else.

OCS caseworkers testified that the parents generally failed to incorporate the lessons from their parenting classes into their lives. The testimony indicated that Nia and Kyler were often combative and deflective, insisting that they did not need to complete any more services before regaining custody of their children. The caseworkers testified that Nia often seemed overwhelmed and stressed because she worked two jobs and financially provided for Kyler, and that both parents focused on

their frustration with OCS and the foster parents instead of improving their ability to care for their children.

### B. Proceedings

#### 1. Termination trial

A ten-day termination trial began in September 2021 and concluded in March 2022. The witnesses included OCS and RCPC employees who discussed their interactions with the parents and the parents' progress. There was expert testimony from a psychiatrist, several therapists, and other professionals who had been involved with the family. The court also heard testimony from the interviewer at Stevie's Place, Kyler and Nia's landlord, Nia's obstetrician, the director of a parenting resource center, and Nicolette, Nia's mother and the children's foster mother.

##### a. Admission of the Stevie's Place interview

The Stevie's Place interviewer testified she was trained in forensic interviewing and conducted Ophelia's interview using the "Words First" protocol recognized in Alaska and a majority of other states. She explained that there are various phases to this technique, but that "the premise is asking basically open-ended questions and having the child participate in a narrative about something they may be disclosing." She explained that interviewers are cautioned against doing repeat interviews with children about the same incident of abuse because that "can be . . . an influence in [itself]." She explained that children might get the sense in a re-interview that there is "something they're supposed to be talking about," so questions must be structured in such a way that the second interview seems like an extension of the first.

When Nia's attorney suggested in her questioning that the January 2020 interview was a "re-interview," the interviewer replied she was unaware of that and questioned whether the earlier interview concerned the same allegations of abuse. She said she interviewed Ophelia as if it were a first-time interview; all she knew going into

the interview was that there had been an allegation of sexual abuse, not who was involved or any other details.

The court admitted the recorded interview under Alaska Evidence Rule 801(d)(3).[5] The court cited Ophelia's verbal ability and demeanor in the video along with the interviewer's open-ended questions and extensive experience, concluding that "on the whole . . . the statement was taken in a manner that would avoid undue influence of [Ophelia]." As for the parents' concern that the interview was a re-interview concerning the same incident of abuse, the court reasoned that assuming it was a re-interview, that fact would go to the evidence's weight rather than its admissibility.

### b. Kyler's request for a continuance

When OCS rested its case in November 2021, the only witness yet to testify was Kyler's expert, Dr. Zelig. Trial was supposed to resume with Dr. Zelig's testimony in early January 2022 but was continued twice because of conflicts in Kyler's attorney's schedule.

When trial resumed in March 2022, however, Kyler's attorney informed the court that Dr. Zelig was not available to testify. Originally, Dr. Zelig was scheduled to testify in a different trial on the same day, and thus would have been unavailable to appear as Kyler's witness. Although Dr. Zelig had been informed at the last minute that he was no longer needed in the other trial, he was not prepared to testify in this termination case due to his anticipated unavailability and "payment issues." Kyler's attorney explained that she had notified the other parties of the witness's unavailability the day before but had not asked for a continuance because she was under the impression that OCS had other witnesses to call, so the parties' time would be well

---

[5] *See* Alaska R. Evid. 801(d)(3) (defining recorded statement by child crime victim as "statement[] which [is] not hearsay" so long as numerous criteria are met, including that "the taking of the statement as a whole was conducted in a manner that would avoid undue influence of the victim").

spent. Kyler's attorney then asked for another continuance so that Dr. Zelig could testify sometime within the next few weeks.

OCS and the children's guardian ad litem opposed the motion, and the court denied it. The court noted that the date for Kyler to present Dr. Zelig's testimony had been "set for quite some time" and yet the witness apparently had never planned to be available that day. The court reasoned that his ultimate unavailability due to a lack of preparation did not present good cause to continue the case.

As an offer of proof, Kyler explained that Dr. Zelig would have testified about how Ophelia's history of therapy may have affected the reliability of the Stevie's Place interview. He would have testified that because multiple interviews can lead to false statements, if Ophelia talked to her therapist about the incident and received encouragement in return, it could have affected the accuracy of her recollection.

### 2. The court's termination order

The court found the children in need of aid under AS 47.10.011(6) (substantial physical harm or substantial risk of substantial physical harm), (7) (sexual abuse or substantial risk of sexual abuse), (8) (mental injury or substantial risk of mental injury), and (11) (parental mental illness "that places the child at substantial risk of physical harm or mental injury"). The court also found that OCS proved by clear and convincing evidence that it made reasonable efforts to reunify the family, as it provided the parents with "several signed case plans," "parenting education courses," "individual and group therapy," "psychological evaluations," and "several different types of visitation" and continued "to evolve the case plan requirements and services offered to meet treatment recommendations and help the parents remedy their conduct based on the parents' input." Finally, the court found that the parents failed to remedy the conduct that placed the children at risk of harm and that termination was in the children's best interests.

Nia and Kyler appeal.

## III. STANDARD OF REVIEW

Whether a child is in need of aid is a factual determination we review for clear error.[6] "Clear error exists when we are 'left with a definite and firm conviction that the superior court has made a mistake.' "[7] Whether OCS made reasonable efforts to reunify a family is a mixed question of law and fact.[8] "For mixed questions, 'we review factual questions under the clearly erroneous standard and legal questions using our independent judgment.' "[9]

"We review a trial court's 'decision to admit or exclude evidence for abuse of discretion.' "[10] We disregard harmless errors,[11] and we "reverse an evidentiary ruling only if an error prejudicially affected a party's substantial rights."[12] Finally, "[w]e will not disturb a trial court's refusal to grant a continuance unless an abuse of discretion is demonstrated. An abuse of discretion exists when a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling."[13]

---

[6] *Duke S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 433 P.3d 1127, 1132 (Alaska 2018).

[7] *Josephine B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 174 P.3d 217, 220 (Alaska 2007) (quoting *Winston J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 134 P.3d 343, 345 (Alaska 2006)).

[8] *Kylie L. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 407 P.3d 442, 448 (Alaska 2017).

[9] *Joy B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 382 P.3d 1154, 1162 (Alaska 2016) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1274 (Alaska 2014)).

[10] *Liimatta v. Vest*, 45 P.3d 310, 313 (Alaska 2002) (quoting *Bennett v. Weimar*, 975 P.2d 691, 694 (Alaska 1999)).

[11] *Luther v. Lander*, 373 P.3d 495, 499 (Alaska 2016).

[12] *Lum v. Koles*, 314 P.3d 546, 552 (Alaska 2013).

[13] *Wagner v. Wagner*, 299 P.3d 170, 173 (Alaska 2013) (quoting *Azimi v. Johns*, 254 P.3d 1054, 1059 (Alaska 2011)).

## IV. DISCUSSION

### A. The Superior Court Did Not Abuse Its Discretion By Admitting The Stevie's Place Interview.

Under Alaska Evidence Rule 801(d)(3), the recorded statement of the child victim of a crime is not considered hearsay and is admissible so long as the child is under the age of 16 and the following criteria are met:

> (A) the recording was made before the proceeding;
> (B) the victim is available for cross-examination;
> (C) the prosecutor and any attorney representing the defendant were not present when the statement was taken;
> (D) the recording is on videotape or other format that records both the visual and aural components of the statement;
> (E) each person who participated in the taking of the statement is identified on the recording;
> (F) the taking of the statement as a whole was conducted in a manner that would avoid undue influence of the victim;
> (G) the defense has been provided a reasonable opportunity to view the recording before the proceeding; and
> (H) the court has had an opportunity to view the recording and determine that it is sufficiently reliable and trustworthy and that the interests of justice are best served by admitting the recording into evidence.[14]

The parents' argument on appeal focuses on subsection (F); they argue that Ophelia's interview at Stevie's Place was not "conducted in a manner that would avoid undue influence of the victim." They contend that the superior court "failed to recognize the specific issue" of an earlier interview unduly influencing a later one. They point to the interviewer's acknowledgement that "repeat interviews can be . . . an influence in themselves" and her testimony that, unaware that Ophelia had been interviewed before, she conducted the January 2020 interview as a first interview.

OCS argues that there was no risk of undue influence because the interviewer followed forensic interviewing protocol; she began the interview without

---

**14** Alaska R. Evid. 801(d)(3).

knowing any "details of the alleged abuse or the name of the alleged abuser" and simply responded to Ophelia's "spontaneous disclosures" using "broad, open-ended non-leading questions [that eliminated] any risk of influencing Ophelia's answers." OCS also argues that Ophelia's conversations with her therapist would not have influenced her disclosure because of the differences between the therapeutic setting and the forensic interview; quoting the therapist's testimony, OCS explains that the therapist " 'work[s] with what comes up' and does 'not quiz[] [the child] or try[] to lead her in a therapeutic session.' " OCS further observes that there is no information in the record about when an earlier interview took place or even whether it involved the same allegations. OCS suggests that if the first interview was close in time to the first report of sexual abuse, it could have been as far back as March 2018, too far removed from the January 2020 interview to have any undue influence.

Kyler and Nia respond that we should infer that the interviews were about the same incident because OCS did not indicate otherwise during trial, the testimony can be read to support this conclusion, and the superior court implicitly understood this to be the case when it stated that re-interview concerns went to weight rather than admissibility. The parents further argue that even if the first interview was in 2018, there is no evidentiary support for the notion that the passage of time lessens the likelihood of undue influence.

We have not had occasion to apply Rule 801(d)(3)(F), but the court of appeals has explained that it requires trial judges "(1) to affirmatively determine that the child's statement was elicited in a neutral and non-leading manner, and (2) to independently evaluate the reliability and trustworthiness of the statement if it is challenged."[15] The superior court in this case followed these steps. Having reviewed

---

[15] *Augustine v. State*, 355 P.3d 573, 584 (Alaska App. 2015); *see also Powell v. State*, 487 P.3d 609, 614 (Alaska App. 2021) (noting focus of legislature "on ensuring

the interview tape, the court noted that Ophelia "appeared to be . . . very verbal in her responses and her interactions with" the interviewer. The court accepted the interviewer's testimony that she used commonly accepted forensic interviewing protocol and that the limited information she had at the start of the interview "was vague enough to allow [her] to know . . . what she was interviewing about but without giving her enough information that she would be able to lead [Ophelia] or influence [Ophelia's] answers." Ultimately, the court found that "on the whole . . . the statement was taken in a manner that would avoid undue influence of [Ophelia]."

In essence, the parents ask us to hold that a second forensic interview must be presumed to have been unduly influenced by an earlier interview even when, as here, we lack any information about the first interview, and the expert testimony indicated only that undue influence *may* be a concern. We decline to adopt such a rule. Nothing in the record leads us to question the superior court's careful analysis. The court provided a more-than-adequate explanation of why it found Ophelia's statements reliable and trustworthy in the context of the evidence before it. The decision to admit the recording of the Stevie's Place interview was not an abuse of discretion.[16]

## B. The Superior Court Did Not Err By Concluding That OCS Engaged In Reasonable Efforts To Reunify The Family.

OCS must make "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home."[17]

---

the reliability of the child's recorded statements and protecting the defendant's right to challenge the trustworthiness of those statements" in drafting Evidence Rule 801(d)(3)(F)).

[16] Nia argues that without the recording there is insufficient evidence to support the CINA findings under AS 47.10.011. Because we conclude that the recording was properly admitted, we need not reach this argument.

[17] AS 47.10.086(a).

The efforts "need not be perfect."[18]  Rather, they "must be evaluated in light of the circumstances of each particular case, including the parent's actions or inaction."[19]  We evaluate OCS's efforts in light of "the entire history of the services that OCS has provided a parent."[20]

We conclude that OCS's efforts in this case were reasonable overall.  OCS consistently made and updated both individual and family case plans.  It referred the parents to a number of parenting classes, domestic violence intervention programs, and batterers' intervention programs, and it arranged weekly or more frequent visitation, first in-person and then telephonic.  OCS tailored the case plans to the family's changing needs, treating the case plan goals as "fluid" and shifting focus over time from parenting skills to the parents' counseling and mental health needs.

Nia argues that OCS failed to engage in reasonable efforts because despite recognizing her need for therapy, citing it repeatedly as an action item in her case plans, and learning about her desire for a culturally competent therapist, it failed to connect her with a therapist who understood her Native Hawaiian culture.  She points out that a psychologist who evaluated her recommended that she participate in therapy with someone trained and experienced in treating individuals from Pacific Islander and Pacific Rim cultures, but OCS continued to rely on therapists without such training.

OCS connected Nia with two different therapists with whom she did not establish therapeutic relationships, then asked her for her Hawaii provider's contact information, which she failed to provide.  Nia continued to discuss individual therapy with her caseworker, but by the time of trial they had not yet agreed on a new referral.

---

[18]  *Audrey H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[19]  *Id.*

[20]  *Burke P. v. State., Dep't of Health & Social Servs., Off. of Child.'s Servs.*, 162 P.3d 1239, 1245 (Alaska 2007).

Although we recognize the importance of culturally competent therapy, we nonetheless conclude that OCS's efforts over the entire case — for example, engaging Nia with various mental health programs and therapists — are not defeated by this one failure.

Kyler argues that OCS's efforts toward him were not reasonable because it failed to abide by a psychologist's recommendations that forms of therapy other than group therapy would work best for him; that he be allowed supervised visitation in his home; and that he receive services that accommodate his loss of vision. But there was caseworker testimony that OCS's efforts were nonetheless reasonable. Although OCS did refer Kyler to group therapy, it tried individual therapy and various other interventions as well, and none succeeded. OCS considered a trial home visit but determined the parents were not ready. And OCS provided Kyler with information in Braille and referred him to programming that would accommodate his vision loss, but he failed to take advantage of those resources. We conclude that OCS's efforts to reunify the family were reasonable despite the shortcomings cited by the parents.

C.     **The Superior Court Did Not Abuse Its Discretion By Denying A Continuance To Accommodate Kyler's Expert Witness.**

Kyler argues that the trial court erred by denying the continuance he requested so that he could present the testimony of his expert witness, which he contends was critical to his case. Kyler contends that he should not be faulted for failing to present Dr. Zelig on the day promised because he believed OCS had additional witnesses to present and the trial time would therefore be well spent. Kyler argues that the court failed to acknowledge that this mistake could have been corrected quickly and that the delay would not have prejudiced any party. Finally, Kyler argues that Dr. Zelig's testimony would have discussed Ophelia's therapy, which would have been relevant to all the statutory bases for the CINA findings.

Children's need for permanency militates toward timely resolution of all CINA proceedings, especially termination trials.[21] In this case trial began in September 2021 and continued episodically until late November. It was set to resume in January for the sole purpose of hearing from Dr. Zelig but had to be continued twice because of attorneys' scheduling conflicts. As the superior court noted, the final date for hearing the expert's testimony — March 23, six months after trial started — "ha[d] been set for quite some time." Under the circumstances, we cannot conclude that the court abused its discretion by denying the requested continuance.

Even if there was error, it was harmless. Kyler indicated that Dr. Zelig would testify about the interviewing protocol used at Stevie's Place and how Ophelia's therapy may have influenced her disclosure of the alleged sexual assault. But the court found that the children were in need of aid not only because of the alleged sexual abuse, but also because of "physical violence toward[] [Nia] by [Kyler]," other threats and violence by and between the parents, frequent injury to the children while in their parents' care, and the parents' failure "to learn any new skills or to actively work toward[] learning new parenting skills." Assuming that Dr. Zelig had successfully discredited the Stevie's Place interview, the evidence still would have supported a finding that the children were in need of aid under one or more of the four statutory subsections the superior court cited.[22]

## V. CONCLUSION

We AFFIRM the termination of Nia's and Kyler's parental rights.

---

[21]    *Rowan B. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 361 P.3d 910, 914-15 (Alaska 2015).

[22]    *See Jon S. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 212 P.3d 756, 762 (Alaska 2009) (noting that "only one statutory basis is required for a CINA finding").